Donald Gene FRANKLIN, Appellant,

v.

The STATE of Texas, Appellee.

No. 57348.

Court of Criminal Appeals of Texas, En Banc.

May 24, 1978.

Opinion on Rehearing Oct. 24, 1979.

Rehearing Denied Nov. 21, 1979.

Douglas Tinker, Corpus Christi, Clarence Williams, Pat Priest, San Antonio, for appellant.

Ted Butler and Bill M. White, Dist. Attys., Charles T. Conaway, Gordon V. Armstrong, Bill Harris, Alan E. Battaglia and Bennie F. Steinhauser, Jr., Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

DALLY, Judge.

This is an appeal from a conviction for capital murder; punishment was assessed at death. Appellant was indicted in Bexar County, but a change of venue to Nueces County was ordered.

Appellant raises forty–five grounds of error. In our discussion, we shall group these grounds into the following categories: sufficiency of the evidence and closely related issues; denial of requested jury charges; admission and exclusion of evidence; refusal to quash the indictment; jury selection; and jury argument.[1]

### I.

The indictment under which appellant was tried alleged that he intentionally and knowingly caused the death of Mary Margaret Moran by cutting and stabbing her with a knife in the course of committing or attempting to commit kidnapping, robbery, and rape. Each underlying offense was alleged in a separate count. Appellant contends that the trial court erred in refusing to require the State to elect a single count to submit to the jury and in submitting verdict forms which did not require the jury to specify the underlying felony on which their verdict of capital murder was based. Appellant also challenges the sufficiency of the evidence at both the guilt and punishment phases of his trial.

Shortly after midnight on July 26, 1975, the deceased, a nurse at Audie Murphy Veteran's Hospital in San Antonio, was apparently seized by an assailant as she backed

---

1. Our review of the voluminous record in this case was greatly facilitated by the excellent manner of its preparation. We are particularly appreciative of the master index of the statement of facts which was prepared by the clerk and the court reporter, Mr. Jim E. Shepherd.

her car from its space in the outpatient parking lot, stabbed seven times, and taken to an overgrown field several miles from the hospital. She was found by searchers on the afternoon of July 30, still alive and completely nude. Her nurse's uniform and shoes, sweater, underwear, and a used Tampax were found a short distance from the spot where she was found, along with several items of her personal property. The deceased died on the morning following her discovery.

Two witnesses saw the appellant in the parking lot at the time of the abduction. James Carter, an employee of the hospital, testified that, as he walked to his car shortly after midnight, he saw appellant wearing a muscle shirt and standing beside a green Buick with a strap or hose in his hand. Appellant asked Carter where he could find a gas station. Thinking that appellant was siphoning gas, Carter sought out Jerry Galvan, a hospital security officer who was patrolling the parking areas, and related to him what he had seen. Galvan drove his Cushman vehicle to the outpatient parking lot, where he was met by a green Buick driven by a man Galvan identified as appellant. Galvan also observed the deceased's automobile out of its parking space and empty. Galvan turned around and attempted to stop the Buick, whereupon the Buick accelerated and a chase ensued. The Buick drove through a barricade, up a ramp into a grassy field, jumped a curb, and sped away on a city street. Galvan was able to get another close look at the driver of the Buick during the chase, as well as the Buick's license plate number. Returning to the parking lot, Galvan found a trail of blood, subsequently determined to be human blood of the deceased's type, running from her car in the general direction of the spot where Carter had seen appellant and the green Buick.

Using the license plate number reported by Galvan, San Antonio police determined that the green Buick was registered in the name of appellant's stepfather. He, in turn, told the police that he had sold the car to appellant. Before dawn on the morning of the abduction, several police officers arrived at the house in which appellant lived. The green Buick was parked outside. Appellant was awakened and advised of his constitutional rights, after which he voluntarily signed a consent to search. During the search of the house, police found a pair of appellant's pants soaking in a pail of rose—colored water, a muscle shirt and a pair of shoes belonging to appellant, a gold dress belonging to appellant's wife, and two pieces of shag carpet similar to carpet later found in appellant's Buick. Human blood was found in the water and on the muscle shirt and shoes. The blood on the shoes was of the deceased's type. Appellant's pants tested positively for blood, and plant material in the cuffs matched samples taken from the place where the deceased was found. Fibers found on the muscle shirt and dress matched fibers contained in the deceased's sweater.

In a trash can beside appellant's back door, police found the partially burned remains of several of the deceased's personal effects. Among the items found were the deceased's purse, billfold, credit cars, driver's license, checkbook, and nurse's scissors. Blood was found on the billfold and scissors. Also found was a knife, which tests proved could have made the stab wounds in the deceased's body and the cuts found in the deceased's uniform.

During a search of appellant's green Buick, police found a small rope with human blood stains. Human blood of the deceased's type was found on the rear seat and the shag carpeting. The rear seat also had a semen stain, although no spermatozoa were found. Vacuum sweepings from the rear of the car contained hairs matching samples taken from the deceased. Soil from under the Buick's fenders was determined to be the same as that in the area where the deceased was found. The inside door handles had been removed from the rear doors of the Buick so that the doors could not be opened from the inside.

Appellant testified that he owned the Buick and the items removed from his house. He testified that he had loaned both

the Buick and his pants to a Eugene Tealer on the night in question and that Tealer had returned both items after 1:00 a. m. on July 26. He stated that Tealer had told him that he, Tealer, had thrown up on the pants and that it was Tealer who had placed the pants in the pail of water. Appellant could not explain the presence of blood on his clothing, or how the deceased's property came to be in his trash can. It was stipulated that appellant's blood was not the same type as that of the deceased.

Where several ways an offense may be committed are set forth in a statute and embraced in the same definition, are punishable in the same manner, and are not repugnant to each other, they are not distinct offenses and may be charged in one indictment. *Jurek v. State*, 522 S.W.2d 934 (Tex.Cr.App.1975), affirmed, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). An indictment may contain as many counts charging the same transaction as the drafter deems necessary to meet variations in the proof. *Jurek v. State*, supra; *Ex parte Easley*, 490 S.W.2d 570 (Tex.Cr.App.1972). In *Jurek*, we held that an indictment alleging more than one of the aggravating conditions set forth in Art. 1257(b)(2) of the former Penal Code was not duplicitous. V.T.C.A. Penal Code, Sec. 19.03(a)(2), under which appellant was convicted, contains substantially the same wording as former Penal Code Art. 1257(b)(2).

Where only one transaction is charged, and different counts are contained in the indictment to meet possible variations of proof, the State is not required to elect upon such counts. Nor may an election be compelled where different counts charging the same offense are drawn to prevent a variance and there is evidence to support each count. *Floyd v. State*, 164 Tex.Cr.R. 50, 296 S.W.2d 523 (1956); *Smith v. State*, 141 Tex.Cr.R. 387, 148 S.W.2d 844 (1941). In the instant case, there is sufficient evidence to support a conviction under each of the three counts.

The evidence establishes that the deceased was taken by the use of deadly force from the hospital parking lot to the field in which she was found. V.T.C.A. Penal Code, Sec. 20.01(1)(A) and (2)(B). The inside door handles had been removed from appellant's car, which the circumstantial evidence indicates was used to transport the deceased to the field. This is evidence of intent to prevent her liberation. Sec. 20.01(2), supra. The field in which she was secreted was sufficiently overgrown and isolated that it took over four days of intensive searching to find her. V.T.C.A. Penal Code, Sec. 20.-01(2)(A). The evidence is sufficient to support a jury finding that appellant was guilty of the underlying offense of kidnapping. V.T.C.A. Penal Code, Sec. 20.03.

The offense of robbery includes any violence in the course of effectuating theft. *Lightner v. State*, 535 S.W.2d 176 (Tex.Cr. App.1976). In the instant case, the evidence establishes that after the deceased was stabbed several items of her personal property, including her purse, billfold, and credit cards, were taken from her. These items were found in appellant's trash can, where an effort had been made to destroy them. From this evidence, the jury could reasonably conclude that appellant obtained the property without the deceased's effective consent and with the intent to deprive her of the property. V.T.C.A. Penal Code, Sec. 31.03. That appellant may have abandoned the property subsequent to obtaining it is of no consequence. *Banks v. State*, 471 S.W.2d 811 (Tex.Cr.App.1971). The evidence is sufficient to support a jury finding that appellant was guilty of the underlying offense of robbery. V.T.C.A. Penal Code, Secs. 29.01 and 29.02.

A pelvic examination of the deceased prior to her death disclosed no evidence of rape, and vaginal smears taken during the autopsy were negative because the deceased had been having her menstrual period. However, the evidence establishes that after the deceased was seized and stabbed she was taken to the field where she was found stripped naked. Her Tampax was removed. A semen stain was found on the rear seat of appellant's car. Although not sufficient to prove the commission of aggravated rape, the evidence shows the commission of acts

amounting to more than mere preparation and would support a finding that the actions were taken with the specific intent to commit said offense. The evidence is sufficient to support a jury finding that appellant was guilty of the underlying offense of attempted aggravated rape. V.T.C.A. Penal Code, Secs. 15.01, 21.02, 21.03.

Because the evidence is sufficient to support a finding of guilt under each of the three counts, the trial court did not err in submitting each count to the jury. Nor did the trial court err in permitting the jury to return a general verdict of guilty without designating under which count the guilt was found. *Bailey v. State*, 532 S.W.2d 316 (Tex.Cr.App.1975); *Hintz v. State*, 396 S.W.2d 411 (Tex.Cr.App.1965); *Cavazos v. State*, 365 S.W.2d 178 (Tex.Cr.App.1963); *McArthur v. State*, 132 Tex.Cr.R. 447, 105 S.W.2d 227 (1937).

Appellant questions the sufficiency of the evidence as to the probability he would commit criminal acts of violence that would constitute a continuing threat to society. Art. 37.071(b)(2), V.A.C.C.P. We hold that the evidence is sufficient.

During the punishment phase of the trial, the State elicited testimony from several San Antonio police officers that appellant's reputation in the community for being a peaceful and law–abiding citizen was bad. In addition, the psychiatrist who examined appellant at the time of his admission to the Texas Department of Corrections in 1970 testified that he had determined that appellant is a psychopath. The psychiatrist also testified that psychopathy is a continuing condition for which there is no known treatment and that psychopaths tend to repeat the same type of criminal activities on an accelerated scale of severity. It was the opinion of the psychiatrist that appellant would follow the classic pattern of psychopathic activity. On cross–examination, the psychiatrist stated that his prediction was within a reasonable medical certainty. Cf. *Shippy v. State*, 556 S.W.2d 246 (Tex.Cr.App.1977). The above testimony, when considered along with appellant's prior rape conviction and the evidence presented dur-

ing the guilt phase of the trial, is sufficient to support submission of the second issue under Art. 37.071(b), supra, and the jury's affirmative answer thereto. *Shippy v. State*, supra.

## II.

Appellant contends that the evidence is insufficient to establish that the acts of the appellant which were alleged and proved caused the deceased's death. Therefore, he argues, the trial court erred in refusing to submit his requested charge on aggravated assault at the guilt phase and his requested charge on causation under V.T.C.A. Penal Code, Sec. 6.04(a), at the punishment phase. He also contends that the trial court erred in refusing his request, at the punishment phase, for a circumstantial evidence charge with respect to each of the two issues submitted to the jury pursuant to Art. 37.-071(b)(1) and (2), V.A.C.C.P.

The doctor who was in charge of the treatment of the deceased testified that her death was the result of irreversible shock resulting from multiple stabbings and loss of blood and subsequent complications therefrom. He further testified that he believed the deceased might have lived had she been found within forty–eight hours of being stabbed. The medical examiner who conducted the autopsy determined that the deceased died of multiple stab wounds of the chest and throat with punctures of the heart, left lung, and liver, complicated by bilateral broncho–pneumonia and atelectasis of the lungs, inflammatory action around the heart, and fluid and air in the chest cavity. The medical examiner testified that he found no evidence of disease or abnormality other than the conditions produced by the complications of the stab wounds.

Appellant's request for a charge on Penal Code Sec. 6.04, supra, if appropriate at all, should have been made at the guilt phase of his trial. That section of the Penal Code provides that a person is criminally responsible only if the result for which he is being prosecuted would not have occurred but for his conduct, operating either alone or con-

currently with another cause. However, the evidence is insufficient to warrant such a charge in any case. Even if it is assumed that the deceased would not have died from the stab wounds had she received prompt medical attention after the assault, the fact remains that her subsequent complications derived from the stab wounds. Not only would the deceased not have died but for the stab wounds, there was no concurrent cause of death independent of the stab wounds. The trial court did not err in refusing appellant's requested charge on Penal Code sec. 6.04, supra.

In a prosecution for murder, the issue of aggravated assault is raised when the instrument with which the murder is committed is not a deadly weapon per se or is used in a manner not ordinarily calculated to produce death, and when, in addition, the evidence raises the issue of a lack of intent to kill on the part of the accused. *Corbett v. State*, 493 S.W.2d 940 (Tex.Cr.App.1973), cert. den. 414 U.S. 1131, 94 S.Ct. 871, 38 L.Ed.2d 756 (1974). The evidence in the instant case does not show that the knife used is a deadly weapon per se, but the evidence clearly establishes that it was used in a manner calculated to produce death. Appellant's intent to cause the death of the deceased may therefore be presumed. *Marrero v. State*, 500 S.W.2d 818 (Tex.Cr. App.1973); *O'Brien v. State*, 365 S.W.2d 797 (Tex.Cr.App.1963). There is no evidence of a lack of intent to kill on the part of appellant. See *Corbett v. State*, supra; *Dovalina v. State*, 564 S.W.2d 378 (Tex.Cr.App.1978). The trial court did not err in refusing appellant's requested charge on aggravated assault.

The circumstantial evidence charge is not required with regard to the issue under Art. 37.071(b)(2) of whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *Shippy v. State*, 556 S.W.2d 246 (Tex.Cr.App.1977); *King v. State*, 553 S.W.2d 105 (Tex.Cr.App. 1977). We believe the reasoning of *Shippy*, supra, is also applicable to the issue under Art. 37.071(b)(1) of whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with reasonable expectation that the death of the deceased or of another would result.

As we stated in *Shippy*, supra, a circumstantial evidence charge is not required on every facet of a case that is supported by circumstantial evidence. The established rule distinguishes between proof of the culpable act, a matter of objective historical fact which requires the charge, and proof of *mens rea*, a matter of psychologic fact which does not require the charge. Proof that the defendant acted deliberately and with reasonable expectation that death would result is a matter of psychologic fact. Furthermore, deliberation and expectation are matters that arise from internal psychological processes and, therefore, do not fall within the exception to the general rule we noted in *Shippy*, 556 S.W.2d at 250, footnote 2. We hold that the issue specified by Art. 37.071(b)(1), supra, does not require the use of the circumstantial evidence charge.

### III.

Appellant contends that the trial erroneously permitted the bolstering of unimpeached identification witnesses. He also contends that his post–arrest silence was unlawfully used against him. On the other hand, appellant argues that he should have been permitted to introduce evidence of another crime similar to the charged offense and expert testimony against the death penalty.

In their original testimony, both Carter and Galvan identified appellant as the man they saw in the parking lot on July 26, 1975, but neither witness testified at the time as to any other extrajudicial identification of appellant. However, after the defense rested its case, the State called a San Antonio police officer who testified that Carter and Galvan had each picked appellant out of a lineup. The State then recalled Carter and Galvan who testified as to their lineup identifications of appellant.

While a witness who has identified the defendant at the trial may also testify that he identified the defendant while the de-

fendant was in police custody, it has been held that others may not bolster this unimpeached testimony by corroborating the fact that the witness identified the defendant. *Lyons v. State*, 388 S.W.2d 950 (Tex. Cr.App.1965). However, such error may be waived if the objection to the testimony is not sufficient. *Montemayor v. State*, 456 S.W.2d 126 (Tex.Cr.App.1970). In the instant case, when the police officer was asked who Galvan picked out of the lineup, appellant's objection was, "If it please the Court, Your Honor, that is clearly impermissible under a number of cases and we object to the question." When the same question was asked of Carter, appellant's objection was, "Again, we object to the question, Your Honor." Such objections were not sufficient to preserve the alleged error. *Montemayor v. State*, supra.

Even if we disregard the inadequacy of appellant's objections, his contention does not present reversible error. Where the defendant impeaches *or attempts to impeach* the testimony of the identifying witness, the testimony of a third party as to the witness' extrajudicial identification is admissible. *Turner v. State*, 486 S.W.2d 797 (Tex.Cr.App.1972); *Frison v. State*, 473 S.W.2d 479 (Tex.Cr.App.1971); *Beasley v. State*, 428 S.W.2d 317 (Tex.Cr.App.1968). Appellant sought to impeach both Carter and Galvan with regard to the opportunity each had to view the man in the parking lot. Statements by the witnesses at a pretrial proceeding were used in an attempt to prove inconsistencies in their testimony. Carter's statement at the pretrial proceeding that his identification of appellant was made easier by appellant's resemblance to a movie actor of the 1930's was tested with photographs of the actor. We hold that appellant's efforts to impeach the testimony of the identifying witnesses warranted the admission of the officer's testimony.

After appellant's testimony at the guilt phase of his trial, the State cross-examined him as follows:

"QUESTIONS BY MR. CONAWAY:

"Q. Now, Donald, let me ask you something? Have you ever told this story that you just told here in the Courtroom today before?

"A. Yes, I have. Part of it.

"Q. Have you ever told that story to me before?

"A. No, I haven't.

"Q. Isn't it true that you have been under oath in a Courtroom before Judge Barlow in previous proceedings and you never told us one mumbling word about that tale you just told me?

"MR. PRIEST: We will object to that question. As your Honor knows we were then engaged in pretrial matters in which these matters were not relevant and we object to the question on that basis."

A discussion between counsel and the court was followed by:

"THE COURT: What is the question?

"QUESTIONS BY MR. CONAWAY:

"Q. Do you remember taking the witness stand, Donald Franklin, in San Antonio, Texas, before this same Judge, James E. Barlow; me asking you questions, Mr. Priest being present, this same Court Reporter being present in the Courtroom and me asking you questions about what happened out there at that house and did you say one word about Eugene Tealer or anybody being in that house or—

"MR. PRIEST: Don't say a word until the Judge rules. It is our position he is making undue comments on the exercise of the Fifth Amendment privilege. We ask the Court to—first, we object to the question.

"THE COURT: All right. It is overruled."

Appellant answered this question in the negative. Other questions of a similar nature were also asked over appellant's objection.

It is a general rule of evidence that the prior silence of a witness as to a fact to which he has testified, where such silence occurred under circumstances in which he would be expected to speak out, may be used to impeach the witness during cross-examination. 3A Wigmore, Evidence, Sec. 1042 (Chadbourn rev. 1970), and cases therein cited. And it has long been recognized that where an accused waives his privilege to remain silent and takes the stand, he may be cross-examined upon his testimony with the same latitude as would be exercised in the case of an ordinary witness. *Fitzpatrick v. United States*, 178 U.S. 304, 20 S.Ct. 944, 43 L.Ed. 1078 (1900); *Brown v. United States*, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958). On the other hand, a defendant in a criminal trial who testifies may not be impeached by his silence *at the time of his arrest* and after receiving Miranda warnings. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In the instant case, the challenged cross-examination related to appellant's failure to tell the exculpatory story at the preliminary hearings on appellant's motions to quash the indictment and suppress evidence and identification, a point which the United States Supreme Court expressly did not reach. *Doyle v. Ohio*, supra, footnote six.

Unless prosecutors are allowed leeway in the scope of impeachment cross-examination, some defendants will be able to frustrate the truth-seeking function of a trial by presenting tailored defenses insulated from effective challenge. *Doyle v. Ohio*, supra, footnote seven. Thus, where a criminal defendant takes the stand during his retrial and denies making a statement testified to by a prosecution witness, he may be cross-examined as to why he did not deny making the statement after the same testimony was given at his original trial. *Raffel v. United States*, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926). The right of a defendant to present limited testimony at a pretrial hearing without waiving his Fifth Amendment rights, *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), does not prohibit the use against a defendant of false exculpatory statements made by him at such a hearing with knowledge of their falsity. *United States v. Kahan*, 415 U.S. 239, 94 S.Ct. 1179, 39 L.Ed.2d 297 (1974). And where a criminal defendant takes the stand on his own behalf, prior inconsistent statements by him to the police may be used to impeach his testimony, even though the statements were obtained in violation of the defendant's *Miranda* rights and could not have been used by the State as direct evidence of guilt. *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971);[2] *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). Evidence obtained through an unlawful search and seizure may also be used for the purpose of impeaching a defendant's trial testimony. *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954).

When the appellant testified for limited purposes at the pretrial hearings the State was properly restricted in its interrogation and cross-examination of the appellant, but the appellant in those hearings was free to testify to, and had the opportunity to testify to, the same exculpatory version of the facts as he later did before the jury. We hold the trial court did not err in permitting the State to cross-examine appellant before the jury as to why he had not related his

2. This case may be distinguished from *Butler v. State*, 493 S.W.2d 190 (Tex.Cr.App.1973). In *Butler v. State*, supra, a majority of this Court refused to apply the holding of *Harris v. New York*, supra, because of a contrary statutory policy expressed in Art. 38.22, V.A.C.C.P. In *Butler*, to impeach the defendant a police officer was allowed to testify concerning a statement he overheard the defendant make to his wife three hours after his arrest while the defendant was in custody. In this case, after appellant testified to exculpatory facts before the jury, he was asked on cross-examination why he had not told the same story while under oath in previous court proceedings before Judge Barlow. The appellant had testified on three prior occasions in pretrial proceedings.

exculpatory version of the facts in the pre-trial hearings.

Outside the presence of the jury, appellant elicited testimony that Eugene Tealer, the man to whom appellant testified he had loaned his car and pants on the night the deceased was abducted, had been arrested a few weeks, prior to appellant's trial and charged with the rape of a nurse employed by the Audie Murphy Veteran's Hospital. The alleged rape occurred at another hospital a short distance from the veteran's hospital, where Tealer was an employee. Appellant also established that Tealer had been previously convicted of burglary with intent to rape, a case in which the victim was also a nurse. Appellant contends that the trial court erred in refusing to permit this evidence to go to the jury.

Ordinarily, evidence of offenses committed by parties other than the defendant is inadmissible. *Ferrell v. State*, 429 S.W.2d 901 (Tex.Cr.App.1968). The evidence proffered by appellant is not inconsistent with his guilt. *Florio v. State*, 532 S.W.2d 614 (Tex.Cr.App.1976); *Dickson v. State*, 492 S.W.2d 267 (Tex.Cr.App.1973). Although appellant apparently sought to establish mistaken identity, the proffered evidence does not establish that appellant had ever been mistakenly identified as Tealer. Cf. *Holt v. United States*, 342 F.2d 163 (5th Cir. 1965). Furthermore, the probative value of the evidence is weakened by the fact that appellant's original statements to the police, prior to Tealer's arrest, were to the effect that he had loaned his car and pants to Eugene "Smokey" *Taylor*. In checking these statements, the police determined that Taylor was in jail on the night the deceased was abducted. Tealer was brought to the courtroom during appellant's trial, and both Carter and Galvan testified that he was not the man they saw in the outpatient parking lot on July 26, 1975. Given its lack of connection to the offense charged, the trial court did not err in excluding the evidence.

During the punishment phase of the trial, appellant proposed to call a sociologist who would have testified that the death penalty does not, in his opinion, deter crime. He would also have related the history of the death penalty in Texas, pointed out the opposition to the death penalty of several religious groups, and described what occurs at an electrocution. The trial court held that the proffered testimony was irrelevant and inadmissible and refused to order the payment of public funds to bring the witness to the trial.

During the punishment phase of a capital murder trial evidence may be presented as to any matter that the trial court deems relevant. Both the State and the defendant may present argument for or against the sentence of death. Art. 37.071(a), V.A. C.C.P. What is essential is that the jury have before it all possible relevant information about the defendant whose fate it must determine. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Robinson v. State*, 548 S.W.2d 63 (Tex.Cr.App.1977).

The expert testimony proffered by appellant was relevant only to the issue of the wisdom of the death penalty generally, an issue which was settled by the legislature when it enacted V.T.C.A. Penal Code, Sec. 19.03. The testimony was irrelevant to either of the special issues submitted to the jury, Art. 37.071(b)(1) and (2), V.A.C.C.P., and contained no information about appellant whatsoever. The trial court did not err in holding the proffered testimony inadmissible.

## IV.

Appellant contends that his motion to quash the indictment should have been granted because of the unlawful composition of the grand jury which returned the indictment. He also questions the nature and sufficiency of the evidence on which the indictment was based. Also, appellant challenges the manner in which the Bexar County Criminal District Attorney decides whether to seek a capital murder indictment.

Appellant contends that the grand jury which indicted him had no members below

the age of thirty as a result of the systematic exclusion of such persons from grand jury service in Bexar County. However, appellant has presented no rationale or evidence to justify his suggestion that persons under thirty are a recognizable, distinct class, singled out for different treatment under the laws as written or applied. See *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977).

Among any age group there will be vast variations in attitudes and experiences. The fact that two persons are the same age does not necessarily give them a community of interest. We hold that an arbitrarily defined age group does not constitute a recognizable class for the purpose of determining the lawfulness of a grand jury selection system. See *United States v. Kuhn*, 441 F.2d 179 (5th Cir. 1971); *United States v. Gast*, 457 F.2d 141 (7th Cir. 1972), cert. den. 406 U.S. 969, 92 S.Ct. 2426, 32 L.Ed.2d 668 (1972); *United States v. Potter*, 552 F.2d 901 (9th Cir. 1977); *United States v. Guzman*, 337 F.Supp. 140 (D.C.N.Y.1972); *Quadra v. Superior Court of San Francisco*, 378 F.Supp. 605 (D.C.Cal.1974); *State v. Williams*, 310 So.2d 528 (La.1975); *Hopkins v. State*, 19 Md.App. 414, 311 A.2d 483 (1973). Cf. *United States v. Butera*, 420 F.2d 564 (1st Cir. 1970); *People v. Marr*, 67 Misc.2d 113, 324 N.Y.S.2d 608 (1971).

Appellant alleges that the indictment was based solely on the hearsay testimony of five assistant district attorneys. Assuming this is so, appellant does not present reversible error. *Forbes v. State*, 513 S.W.2d 72 (Tex.Cr.App.1974); *Carpenter v. State*, 477 S.W.2d 22 (Tex.Cr.App.1972); *Jackson v. State*, 470 S.W.2d 201 (Tex.Cr.App.1971). Also see *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956).

Appellant contends that because the Bexar County Criminal District Attorney exercises his discretion whether to seek a capital murder indictment on the basis, in part, of the heinousness of the crime, the results are arbitrary and discriminatory in violation of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). We disagree. The evidence adduced by appellant at the hearing on his motion to quash merely illustrates the exercise of prosecutorial discretion as recognized and approved in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). See also *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Livingston v. State*, 542 S.W.2d 655 (Tex.Cr.App.1976). This ground of error is without merit.

### V.

Appellant contends that twelve venire members were improperly excluded from the jury for cause in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). He also contends, as to five of these venire members, that even if they were disqualified under *Witherspoon* they were nevertheless qualified under V.T.C.A. Penal Code, Sec. 12.31(b), and were, therefore, improperly excluded.

The latter contention is without merit. In a capital murder case, a prospective juror may be disqualified under *Witherspoon*, Sec. 12.31(b), or both. *Brock v. State*, 556 S.W.2d 309 (Tex.Cr.App.1977). If a prospective juror is disqualified under *Witherspoon*, the fact that he may or may not have been disqualified or even questioned under Sec. 12.31(b), supra, is of no consequence. *Brock v. State*, supra. On the other hand, where a prospective juror is disqualified under Sec. 12.31(b), supra, it is not necessary for the trial court to determine whether he is qualified under *Witherspoon*. *Hughes v. State*, 562 S.W.2d 857 (Tex.Cr.App.1978); *Hughes v. State*, 563 S.W.2d 581 (Tex.Cr.App.1978); *Hovila v. State*, 562 S.W.2d 243 (Tex.Cr.App.1978); *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App. 1977); *Moore v. State*, 542 S.W.2d 664 (Tex. Cr.App.1976). The exclusion of the twelve venire members was proper, therefore, so long as each was disqualified under one of the two tests.

Albert DeAses was disqualified under both Sec. 12.31(b), supra and *Witherspoon*. He testified that while the mandatory life sentence would not affect his deliberations, the mandatory death penalty would. He also testified that under no circumstances would he consider giving the death penalty.

Mrs. T. A. Brown was disqualified under Sec. 12.31(b), supra. She testified that her deliberations "might be" affected by her knowledge of the possible punishment. She also testified that this knowledge would influence her determination of the fact issues.

Dorothy Mae Clawson was disqualified under Sec. 12.31(b), supra. She testified that her deliberations would be affected by her knowledge of the punishment.

Jimmy Faye Terrell was disqualified under *Witherspoon*. She testified that she could conceive of no situation in which it would be appropriate to punish someone by death, regardless of what the guilty person had done. She also testified that she could not vote for the death penalty.

Arlynn J. Turner was disqualified under Sec. 12.31(b), supra. She testified that she would be unable to look at the facts objectively in light of her knowledge of the punishment.

Angela Sanchez was disqualified under *Witherspoon*. She testified that she was against the imposition of the death penalty under any circumstances and could not serve on a jury where it came into play.

Mary Lee Shuler was disqualified under Sec. 12.31(b), supra. She testified that her deliberations would be affected by her knowledge of the punishment.

Clarence Stuart was disqualified under *Witherspoon*. He testified that while he could vote to convict in a circumstantial evidence case, he would never vote for the death penalty in such a case. He was biased against law upon which the State was entitled to rely. See *Freeman v. State*, 556 S.W.2d 287 (Tex.Cr.App.1977).

Mrs. Edway T. Askey was disqualified under *Witherspoon*. After she testified that she was opposed to capital punishment, the following exchange with the district attorney took place:

"Q. And it is a feeling that you have had for some time, that is all your life, that it is not proper to punish someone by taking his life regardless of what he might have done, no matter what his crime might have been? Is it your feeling taking someone's life should be left to God and not men or women?

"A. I believe they should be punished, you know, go to prison or, you know,–

"Q. Right.

"A. Some kind of punishment.

\*      \*      \*      \*      \*      \*

"Q. If someone commits a crime he should be punished but if I understood your statement to me it was that you were opposed to the death penalty and you don't go alone [sic] with punishing somebody that strong. Is that what you are telling me?

"A. Well, I just don't believe in it.

\*      \*      \*      \*      \*      \*

"Q. Could you, under no circumstances, see yourself sitting on the jury and hearing evidence in a case, a capital murder case, listening to the evidence and hearing that somebody had committed a crime, a terrible crime, and knowing by your participation in the trial that the person on trial might be put to death, could you ever do that in keeping with your conscience?

"A. I don't know. I guess–it is not my religious belief. I guess it is my conscience, I guess. I just believe in punishing them."

After explaining to her the procedure used at the punishment phase, appellant's counsel asked:

"Q. Under those circumstances, then, could you listen to the facts in the

case and determine whether the individual was guilty of capital murder or not guilty of capital murder without being effected [sic] in that decision by the fact that the law might impose the death penalty?

"A. I wouldn't know.

"Q. I am sorry, ma'am?

"A. I said I don't know.

\* \* \* \* \* \*

"Q. ... Do you think you can consider the facts and decide about the facts without being effected [sic] by the fact that there is a possibility that the sentence will be life or death?

"A. I think the sentence would be life."

Further questions elicited a statement that she thought she could answer the questions of fact without being affected by the death penalty.

In the light of the cold record before us, it is difficult to say whether Askey unequivocally stated whether she would automatically vote against the imposition of death. See *White v. State*, 543 S.W.2d 104 (Tex.Cr. App.1976). However, *Witherspoon* does not require certain formal answers, and Askey's answers reflect not only on her feelings, but on her ability to serve as a fair and impartial juror. *Tezeno v. State*, 484 S.W.2d 374 (Tex.Cr.App.1972). The trial court did not err in excluding her from the jury.

Robert R. Pate was disqualified under Sec. 12.31(b), supra. He testified that he believed that his knowledge of the punishment would affect his deliberations.

Carolyn Snapka was disqualified under Sec. 12.31(b), supra. The record contains the following exchange:

"THE COURT: ... Now, would the fact that you know what the punishment will be or could be if you find the man guilty, would that effect [sic] your deliberations as to the facts or color your deliberations?

"JUROR: I guess so.

"THE COURT: Do you think that when you are looking over the facts you would always have it in the back of your mind what the punishment might be?

"JUROR: Yes.

"THE COURT: The question really addresses itself to the objectivity, whether you think you can be objective. Do you think you can view the facts and pass on the facts objectively, uneffected [sic] by the fact you know what punishment might be?

"JUROR: I think so.

"THE COURT: You think you can or cannot?

"JUROR: I think I can."

After further explanation, the court again asked if the knowledge of the punishment would affect her deliberations, to which she replied, "Yes."

The answers are plainly contradictory. In such a case, we are reluctant to second-guess the decision of the trial judge who had the benefit of observing the venire member's demeanor and tone of voice. See *Hughes v. State*, 563 S.W.2d 581 (Tex.Cr. App.1978); *White v. State*, supra; *Tezeno v. State*, supra. The trial court did not err in excluding Snapka from the jury.

Patricia Villareal was disqualified under Sec. 12.31(b), supra. She testified that the nature of the punishment "would always be in the back of my mind," and that she thought that her deliberations would be affected.

## VI.

Appellant complains of six instances of allegedly improper jury argument by the prosecutor. The first of these instances occurred after defense counsel, in his argument, had stressed to the jury that the evidence was circumstantial and had pointed out what he argued were weaknesses in the testimony of two witnesses. He then stated:

"And I tell you—I will start out by right now telling you that I don't know whether Donald Gene Franklin is guilty of this

crime. I don't know. But, it certainly worries me. It certainly worries me. And, I submit, you don't know either."

Thereafter, another of appellant's attorneys elaborated on this statement in his argument. After a reference to the foregoing the prosecutor stated:

"Now, there had [sic] been considerable discussion about how the two or three—the two attorneys that address you for the defendant do not believe that Donald Gene Franklin is guilty of this crime. I will tell you I don't believe it, I know it. One of them said I don't know it. I know it.

"MR. PRIEST: If it please the Court, he is outside the record. He is expressing his personal opinion which he has no right to do.

"MR. CONAWAY: From the evidence, Your Honor.

"THE COURT: Overruled, Counsel.

"MR. PRIEST: Note our exception.

"MR. CONAWAY: From the evidence I know, as you must, that he is guilty. One of his own lawyers expressed the opinion, after his client had got up there and said, 'I didn't kill that woman,' his own lawyer said he didn't believe him. You see?"

Prosecutors must not inject their personal opinion of the accused's guilt into their jury argument. *Baldwin v. State*, 499 S.W.2d 7 (Tex.Cr.App.1973). However, the argument complained of here is based on an analysis of the evidence and is a reasonable deduction therefrom. See *Sikes v. State*, 500 S.W.2d 650 (Tex.Cr.App.1973); *Lacy v. State*, 374 S.W.2d 244 (Tex.Cr.App.1963). Furthermore, the argument was invited by the statements of defense counsel. See *Hill v. State*, 518 S.W.2d 810 (Tex.Cr.App.1975); *Hefley v. State*, 489 S.W.2d 115 (Tex.Cr.App.1973). The trial court did not err in overruling appellant's objection.

Appellant contends that the prosecutor twice made an improper reference to the parole law. The first of these references occurred during the guilt phase of the trial.

"In 1970 in San Antonio for rape, he gets ten years. Now then, you would think that ten years would mean ten years. You would think ten years would mean ten Christmases. You would think ten years would mean ten birthdays, which would mean that before we would have to put up with this rapist again it would be 1980?"

The trial court sustained appellant's objection and instructed the jury that it was not to consider any aspect of punishment. Appellant's motion for a mistrial was denied.

Appellant's 1969 rape conviction was in evidence, as were his prison records, which showed that he had received a ten-year sentence. From a reading of the records, the jury could easily ascertain that appellant had not served the full ten years. Without approving the quoted argument, we hold that under the circumstances the impropriety was cured by the prompt instruction of the trial court. *Holloway v. State*, 525 S.W.2d 165 (Tex.Cr.App.1975); *Hughes v. State*, 493 S.W.2d 166 (Tex.Cr. App.1972); *Graham v. State*, 422 S.W.2d 922 (Tex.Cr.App.1968).

The second reference to the parole law came during the punishment phase of the trial. The prosecutor argued as follows:

"MR. WHITE: . . . They are going to tell you, well, if he is locked up down there for life then he can't get out and do those things. Well, you remember what the doctor told you and you remember the facts of this case, ladies and gentlemen, and don't forget them. You heard the doctor say, 'Well, he did ten in four.' And the gates of that penitentiary opened and out came Donald Franklin to rape and ravage the people in Bexar County. And, if you want to have it on your conscience to let this man out of the penitentiary again—

"MR. PRIEST: Your Honor, that is expressly asking the jury to go contrary to the Court's instructions.

"THE COURT: Sustain the objection to it.

"MR. PRIEST: We ask the jury be instructed to disregard Counsel's comment.

"THE COURT: I will instruct the jury they are bound to follow the Court's instructions in the charge of the Court."

Appellant's motion for a mistrial was denied.

The court's charge to the jury contained several instructions. The appellant's objection was not sufficient to preserve the alleged error. *Sloan v. State*, 515 S.W.2d 913 (Tex.Cr.App.1974). Furthermore, the error, if any, was cured by the trial court's prompt instruction to the jury. *Hughes v. State*, 493 S.W.2d 166 (Tex.Cr.App.1973); *Graham v. State*, supra. Cf. *Clanton v. State*, 528 S.W.2d 250 (Tex.Cr.App.1975); *Marshburn v. State*, 522 S.W.2d 900 (Tex.Cr.App.1975).

Complaint is made that the prosecutor improperly argued that the jury should convict appellant on his prior record. The complaint is based on the following:

"MR. CONAWAY: ... Now, recall, too that his fingerprints aren't found on [deceased's car]. But, again, recall this: He is a convicted rapist. He has been there, you see. And he is not grabbing that car, he is grabbing her.

"MR. PRIEST: If it please the Court, Your Honor, he is suggesting to the jury that they should use the defendant's prior conviction for some purpose other than to judge his credibility and we object to it and ask they be instructed to disregard it.

"THE COURT: Overruled. Let's proceed.

"MR. PRIEST: Note our exception.

"THE COURT: Go ahead, Counsel.

"MR. CONAWAY: A person who has been convicted of rape and punished by a sentence of ten years is going to be, I submit to you, more careful the second time around, you see. He didn't leave any fingerprints on the car. That doesn't mean he didn't touch it, it just means he didn't leave any fingerprints on the car. That's all...."

Although the statements of the prosecutor were a reasonable deduction from the evidence, the evidence of appellant's prior conviction had been admitted for the sole purpose of assisting the jury in determining his credibility as a witness. The prosecutor's argument asked the jury to consider the prior conviction in determining the weight of the physical evidence. The trial court should have sustained appellant's objection. See *Livingston v. State*, 531 S.W.2d 821 (Tex.Cr.App.1976); *Marshburn v. State*, supra.

Although the objection should have been sustained, the error does not require a reversal. The principal point of the challenged argument, that the absence of appellant's fingerprints on the deceased's car did not mean that appellant was not the assailant, was one the prosecutor was entitled to make. Furthermore, the physical evidence against appellant was substantial, and the court's charge directed the jury to consider appellant's prior conviction only as it related to his credibility. Under the circumstances, the error was harmless. *Threadgill v. State*, 156 Tex.Cr.R. 157, 239 S.W.2d 813 (1951); *Everett v. State*, 153 Tex.Cr.R. 180, 218 S.W.2d 471 (1949).

Appellant alleges that the prosecutor, in his argument, improperly bolstered the credibility of the San Antonio police department generally, and the head of the homicide bureau in particular. The complained-of argument was as follows:

"Detective Keene—Now, here is a man they call a liar. He has been with the San Antonio Police Department for eighteen years. He is head of the homicide bureau. Now, San Antonio, I think living there, has excellent police department [sic]. We have a good one. I am proud of it."

In their prior arguments, appellant's counsel had on several occasions called Keene a liar. On one such occasion, appellant's counsel stated, "... David Keene sat on that witness stand and lied like a dog." Furthermore, appellant's counsel had ar-

gued that the San Antonio police had been careless in handling the physical evidence. The prosecutor's statement was invited. *Lapp v. State*, 519 S.W.2d 443 (Tex.Cr.App. 1975).

Finally, appellant complains that the closing remarks of the prosecutor at the guilt phase invited the jury to convict on the basis of evidence the State would later bring forward. The prosecutor's statement and appellant's objection were as follows:

"MR. CONAWAY: ... I will ask you to return a verdict of capital murder against Donald Gene Franklin because that is what he did, and *we will proceed to the second proceeding of this trial and you will hear more about him.* [Emphasis added.]

"Thank you very much.

"THE COURT: All right. Take the jury to the jury room. You can arrange to take the jury to lunch. When they come back put them in the jury room to deliberate and notify me if you have any problem. You may go with the bailiff.

"Everybody keep your seat while the jury files out. Go with the bailiff, ladies and gentlemen.

"MR. TINKER: When they leave I would like to say something in the record, Your Honor.

"THE COURT: All right. (Thereupon, at this time the jury was taken from the Courtroom.)

\*    \*    \*    \*    \*    \*

"MR. TINKER: Your Honor, the last comment of counsel in his argument said they would hear more about him when—at the second hearing. I want to object to that and ask for a mistrial at this time.

"THE COURT: All right. That is denied."

The objection was not timely. See *Van Bibber v. State*, 371 S.W.2d 880 (Tex.Cr. App.1963); *Smith v. State*, 157 Tex.Cr.R. 21, 246 S.W.2d 187 (1952). The objection was general, and did not specify the basis

for appellant's complaint. See *Patterson v. State*, 509 S.W.2d 857 (Tex.Cr.App.1974); *Lamberson v. State*, 504 S.W.2d 894 (Tex. Cr.App.1974). Furthermore, the remark of the prosecutor was merely a statement of a fact of which the jury was aware: that, should they find appellant guilty of capital murder, they would then hear the evidence with regard to punishment. No error is presented.

The record discloses that the appellant had a trial in which he was afforded all of his constitutional rights. The extreme penalty which has been assessed is appropriate considering the background of the appellant and the enormity of the crime and the circumstances of its commission.

The judgment is affirmed.

W. C. DAVIS, J., concurs in the result.

ODOM, J., dissents.

PHILLIPS, Judge, dissenting.

I believe the majority to have strayed from sound principles of due process and due course of law in their determination that appellant's Grounds of Error 19, 20, 21, and 7 do not constitute reversible error. Although the crime committed was heinous, the rule of law must still control our determination. I therefore dissent for the ensuing reasons.

I

In Grounds of Error 19, 20, and 21, appellant complains of the prosecutor's use of the appellant's failure to relate the exculpatory story related at trial during pretrial hearings at which appellant previously testified. This omission on the part of the appellant was used by the prosecutor to impeach the appellant's exculpatory story during the prosecutor's cross–examination of appellant.

The record of pretrial proceedings reflects that the appellant took the stand three times. The first time was for the

limited question of whether he was competent at that particular time to assist his attorneys in conducting their pretrial hearing on appellant's motion to suppress evidence and motion to suppress identification. At that time appellant testified to having sustained medical problems the night prior to the hearing which required medication and that there were some lingering aftereffects from such medication which impaired his ability to assist his attorneys. Later that day the actual hearings on the motion to suppress evidence and identification of appellant were conducted. Prior to such hearings, the following colloquy with the court took place:

"MR. PRIEST: Your Honor, I want to call the defendant to the stand for the purpose of the motion only. But, before I do I would reurge to the Court the motion we have previously filed to restrict the cross–examination of the defendant by the State to matters brought out on direct having bearing on the motion to suppress and nothing else.

"THE COURT: I think the case law holds if he takes the stand he can take the stand on the motion to suppress for limited purposes related to the motion itself. So, I assume that is what you are relating it to.

"MR. PRIEST: That is correct, your Honor.

"MR. CONAWAY: Judge, *I am in perfect accordance with the proposition of the defendant taking the stand for limited purposes.*" (Emphasis added)

The scope of the direct examination at this hearing related to the circumstances surrounding the appellant's arrest and execution of the San Antonio Police Department consent to search form. The district attorney attempted to ask several incriminating questions, all of which were objected to and said objections were sustained.

The next time the appellant testified was at the subsequent hearing on the motion to suppress identification. Again, at the outset of that hearing, the following colloquy transpired with the court:

"MR. PRIEST: Your, Honor, again, we will call the defendant for the limited purpose of this motion and his rights to counsel and the issues surrounding that question.

"THE COURT: All right. Have a seat. Go ahead, counsel. Let's proceed."

At this hearing the appellant testified strictly to the question of whether he requested and was given the assistance of counsel before a lineup in the San Antonio Police Department. No questions relating to the exculpatory story were asked of the appellant while he testified.

During the cross–examination of appellant at trial by the same prosecutor who conducted the pretrial hearings, the following transpired:

"QUESTIONS BY MR. CONAWAY:

"Q    Now, Donald, let me ask you something? Have you ever told this story that you just told here in the Courtroom today before?

"A    Yes, I have. Part of it.

"Q    Have you ever told that story to me before?

"A    No, I haven't.

"Q    Isn't it true that you have been under oath in a Courtroom before Judge Barlow in previous proceedings and you never told us one mumbling word about that talè you just told us?

"MR. PRIEST: We will object to that question. As your Honor knows we were then engaged in pretrial matters in which these matters were not relevant and we object to the question on that basis.

"THE COURT: Well, I will sustain the objection to it.

"MR. CONAWAY: I think I am entitled to show that he has had an opportunity under oath to offer that tale before and he did not do so, Judge.

"MR. PRIEST: We object, Your Honor.

"MR. CONAWAY: At a time whenever he waived his Fifth Amendment rights and took the stand.

"THE COURT: The problem is—

"MR. CONAWAY: I recognize his problem.

"MR. PRIEST: Object to the last statement of Counsel.

"THE COURT: The problem is this, I try cases one after another. I have Court records of what occurs in Court and, the truth is, I don't remember all the time, what the issues were or what was involved.

"MR. CONAWAY: My question is does he remember it, Judge. Do you remember taking the witness stand in San Antonio, Texas?

"MR. PRIEST: He is repeating the very question we objected to and we request a ruling.

"THE COURT: What is the question?

"MR. PRIEST: The Court previously sustained the objection.

"THE COURT: What is the question?

"QUESTIONS BY MR. CONAWAY:

"Q  Do you remember taking the witness stand, Donald Franklin, in San Antonio, Texas, before this same Judge, James E. Barlow; me asking you questions, Mr. Priest being present, this same Court Reporter being present in the Courtroom and me asking you questions about what happened out there at that house and did you say one word about Eugene Tealer or anybody being in that house or—

"MR. PRIEST: Don't say a word until the Judge rules. It is our position he is making undue comments on the exercise of the Fifth Amendment privilege. We ask the Court to—first, we object to the question.

"THE COURT: All right. It is overruled.

"MR. PRIEST: Please note our exception.

"QUESTIONS BY MR. CONAWAY:

"Q  Did you say one mumbling word about Eugene Tealer swapped pants with you, Eugene Tealer came and set fire to that poor woman's purse, did you say one word about never having seen that knife before, did you say one word about loaning that car to Eugene Tealer in open Court under Oath before this same Judge in San Antonio, Texas? Did you say one word at all?

"MR. PRIEST: If it please the Court, he was not asked any of those questions.

"MR. CONAWAY: That wasn't the question. Did you—you could have told that tale down there and you chose not to, didn't you?

"MR. TINKER: Your Honor, there was a hearing in this Court for a specific purpose that had nothing to do with what he may or may not have said. The Court, in my opinion, is committing error in allowing this kind of interrogation to go on. The first reason you have pretrial proceedings is because they are supposed to be done prior to getting into anything in the presence of the jury. This witness was not asked this question. In fact, this Court specifically would not permit that kind of question of this man.

"MR. CONAWAY: He wasn't there.

"MR. TINKER: I have read the record, Your Honor. It is here and I will offer it to the Court.

"THE COURT: We are no longer in pretrial, Counsel. The objection is overruled.

"MR. TINKER: Let me make a tender of the Court's ruling at that time.

"THE COURT: The point is, in pretrial you are bound by certain rules that do not necessarily apply before the jury.

"MR. TINKER: That's right. And at pretrial you ruled you would not permit him to answer questions. Now, he is trying to make it look like this man tried to disguise or hide something because you ruled that he could not testify about it. Now—and I offer, Your Honor, the Court Reporter's notes from that proceeding. It was your ruling that prevented him from testifying.

"THE COURT: All right.

"MR TINKER: Your Honor, also, we request a mistrial at this time because of what has already occurred and I reurge the Court to look at the Statement of Facts and see the Court's ruling at that time, which did not permit him to testify to these facts.

"THE COURT: Objection overruled. Motion for mistrial overruled. Go ahead, Counsel.

"QUESTIONS BY MR. CONAWAY:

"Q Now then, my question, again, I don't think you ever did answer it, was did you ever tell—you had the opportunity sitting on the witness stand in a different Courtroom, same Judge, same defense lawyer,— at least well, two of them, Mr. Williams and Mr. Priest were there, I was there, Judge Barlow was there and you were certainly there and we were talking about what happened out there at your house on the morning when you were arrested. Do you remember that?

"A Yes, sir; I do.

"Q Now then, do you remember telling me anything about, 'I loaned my pants to Eugene Tealer?' Did you tell me anything like that?

"A I only answered the questions that you asked me. I did tell them at the time that they arrested me, the same thing I have just finished stating."

The majority cites Wigmore on Evidence for the general proposition "that the prior silence of a witness as to a fact to which he has testified, where such silence occurred under circumstances in which he would be expected to speak out, may be used to impeach the witness during cross-examination." Ante at 825. Section 1042 of Wigmore on Evidence reads as follows:

"A *failure to assert* a fact, *when it would have been natural to assert it,* amounts in effect to an assertion of the non-existence of the fact. This is conceded as a general principle of evidence (Section 1071 infra).

\*    \*    \*    \*    \*    \*

"There are several common classes of cases:

"(1) Omissions in legal proceedings to assert what would naturally have been asserted under the circumstances.

"(2) Omissions to assert anything, or to speak with such detail or positiveness, when formerly narrating, on the stand or elsewhere, the matter now dealt with." 3A Wigmore, Evidence, Sec. 1042 (Chadbourn Rev.1970)

Notwithstanding the expressed statements of Wigmore and the majority's acknowledgment of the principle that the silence must occur under circumstances wherein an expressed disclaimer or statement would seem more natural, they proceed to disregard the context in which the appellant allegedly failed to relate his exculpatory story. It was *not natural* for appellant to have given the exculpatory story at the pretrial hearing since it was not relevant to any issue at hand. Further, when he was testifying at the pretrial motion hearings, he was not narrating on the matter now dealt with because, as stated, the issues raised by the motions did not bring to bear the facts of the particular offense or facts preceding the offense testified to by the defendant at the trial—in—chief. It is therefore evident that the use of appellant's silence in this case did not fit the justification cited by Wigmore.

The majority goes on to cite a number of unrelated cases concerning the proper scope

of cross–examination. It is worthy of note that these cases were not deemed convincing to the Supreme Court in its decision to preclude the use of an arrestee's silence following receipt of *Miranda* warnings for purposes of impeachment upon cross–examination. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). It is acknowledged that *Doyle* expressly reserved decision on the specific issue now before this Court; i. e., whether use of a defendant's silence at a pretrial hearing can constitutionally be utilized for purposes of impeachment. Notwithstanding the Supreme Court's reluctance to address this issue, certain principles can be distilled from the opinion in *Doyle*. The Supreme Court noted that "every post arrest silence is insolubly ambiguous ..." in light of its mandate that every arrestee be accorded certain warnings, one of which being the right to remain silent. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The decision went on to state that since the arrestee had been advised that he has a right to remain silent, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." 96 S.Ct. at 2245. In this vein and with respect to the particular issue before this Court concerning the use of appellant's silence at the time of his *pretrial hearing* to impeach him, the case of *Simmons v. U. S.*, 390 U.S. 377, 381, 88 S.Ct. 967, 969, 19 L.Ed.2d 1247 (1968), takes on a role similar to that held by *Miranda* in the *Doyle* decision. In *Simmons*, a co–defendant testified at the motion to suppress hearing that he owned the suitcase in which money wrappers from the bank that was recently robbed were found. This same testimony was introduced at the trial–in–chief to establish the co–defendant's ownership of the suitcase, and the Supreme Court held that "when a defendant testifies in support of a motion to sup-

press evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." 390 U.S. at 394, 88 S.Ct. at 976. Again, however, *Simmons* is not directly in point here since *no particular express statement* made by the appellant at his pretrial hearings was introduced for the purpose of showing his guilt or for impeachment. Instead, it was what the appellant *did not say* at the pretrial hearings that was used against him to create the inference that his version of events at the trial was a recently fabricated "tale" unworthy of belief.[1] Before the two pretrial hearings on appellant's motion to suppress evidence and identification, the court was advised that his testimony was for the limited purpose of the issues raised by said motions–a limitation acknowledged both by the court and the prosecutor at the time of the pretrials. At no time during the course of the pretrial hearings were the facts or circumstances surrounding the actual crime relevant. Although no formal warnings were rendered to the appellant at the time of the pretrial hearings as required to be offered an arrestee at the time of arrest pursuant to *Miranda*, it was clear that the appellant was relying on the principle of *Simmons v. U. S.*, supra, i. e.: that the testimony appellant was to offer at the pretrial hearings was for the limited purposes of determining the legal questions raised by the motion to suppress and any inquiry would be no broader than necessary.

An analogous situation is presented in the case of *Johnson v. U. S.*, 318 U.S. 189, 63 S.Ct. 549, 87 L.Ed. 704 (1943). At Johnson's trial the defendant took the stand and testified to numerous issues, but chose to invoke the Fifth Amendment privilege against self–incrimination after having testified to certain matters. The judge granted the claim of privilege, albeit erroneously, yet the prosecutor argued that its invocation

---

[1]. See the colloquy concerning the subject cross-examination reproduced at infra 838 & 839.

showed the defendant to be a liar and to be guilty of the crime charged. Of particular importance to the case at bar is the following excerpt from *Johnson*:

"An accused having the assurance of the court that his claim of privilege would be granted might well be entrapped if his assertion of the privilege could then be used against him. His real choice might then be one different from his apparent one. * * * Elementary fairness requires that an accused should not be misled on that score. If advised by the court that his claim of privilege though granted would be employed against him, he well might never claim it. If he received assurance that it will be granted if claimed, or if it is claimed and granted outright, he has every right to expect that the ruling is made in good faith and that the rule against comment will be observed."

Although this decision was rendered pursuant to the supervisory powers of the Supreme Court, it is relevant to the determination that the use of appellant's silence in the case at bar violated concepts of elementary fairness and deprived the appellant of due process and due course of law. Principles of elementary fairness are equally applicable to the states. *Raley v. Ohio*, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959).

In another case decided pursuant to the Supreme Court's supervisory power over lower federal courts, it was determined that the probative value of a defendant's silence at the time of arrest with respect to his alibi defense was outweighed by the prejudicial impact of using that silence to impeach the defendant. *U. S. v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). The court expressly avoided the constitutional question of whether *Raffel v. U. S.*, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926), survived the decisions of *Johnson v. U. S.*, supra, and *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).[2] The court in *Hale* further wrote:

"If the government fails to establish a threshold inconsistency between silence at the police station and later exculpatory testimony at trial, proof of silence lacks any significant probative value and must therefore be excluded." 422 U.S. at 176, 95 S.Ct. at 2136.

This principle is equally applicable to the case at bar in making our determination that the appellant's silence at the pretrial hearings concerning the transactions he testified to at trial presented no inconsistencies justifying the introduction of the evidence for any purpose. Since the issues raised by the pretrial motion did not involve questions concerning the actual offense itself, there was a valid reason, other than culpability, for the appellant to remain silent at the pretrial stages concerning his exculpatory story. This demonstrates the ambiguity that can attach to silence and how the use of that silence to subsequently impeach can unfairly prejudice a defendant who chooses to testify in his own behalf.

The majority cites numerous cases that are of unquestioned validity, but which do not address the particular issue before us. It is clear that when the defendant engages in a clear falsehood on the stand, his previous inconsistent statements can be used to impeach him.[3] But it is characteristic of the cases cited by the majority that the items being used to impeach the witness at the trial consist of actual statements which carry significantly more probative value than silence.

I would be remiss in not confronting and addressing the potential question of harm-

---

**2.** It should be noted that the majority relies on *Raffel v. U. S.*, supra. In that case the petitioner did not testify at the first trial but chose to testify at the second trial to refute the testimony of a State's witness. The court found that since the testimony of the State's witness at the two trials was the same, the silence at the first trial was of some probative force and was therefore admissible to impeach the petitioner at the second trial.

**3.** See Footnote 11 in *Doyle v. Ohio*, 96 S.Ct. 2240 at 2245.

lessness in the prosecutor's actions in this case. It appears clear that the harmless error rule does apply to *Doyle*–like errors. *Chapman v. United States*, 547 F.2d 1240 (5th Cir. 1977). The rule as set forth in *Chapman*, supra, is as follows:

"... When the prosecution uses defendant's post–arrest silence to impeach an exculpatory story offered by defendant at trial and the prosecution directly links the implausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous. [Citations omitted.]

"When the prosecutor does not directly tie the fact of defendant's silence to his exculpatory story, i. e., when the prosecutor elicits that fact on direct examination and refrains from commenting on it or adverting to it again, and the jury is never told that such silence can be used for impeachment purposes, reversible error results if the exculpatory story is not totally implausible or indicia of guilt not overwhelming. [Citation omitted.]

"When there is but a single reference at trial to the fact of defendant's silence, the reference is neither repeated nor linked with defendant's exculpatory story, and the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to defendant's silence constitutes harmless error. Chapman's fate is to instantiate this third rule.

"The infusion of 'harmlessness' into error must be the exception, and the doctrine must be sparingly employed. A miniscule error must coalesce with gargantuan guilt, even when the accused displays an imagination of Pantagruelian dimensions." 547 F.2d at 1249–1250.

In *Chapman*, the government prosecutor asked the arresting police officer if the defendant said anything after his arrest to which a single, negative answer was given. No further questioning of any witness concerning the defendant's post–arrest silence was conducted, nor was any reference made during closing arguments to such silence. In light of the evidence showing that the defendant was arrested at the rear bank door with a crowbar inserted into the door, the single question and answer was considered harmless error. A similar conclusion was reached in *Meeks v. Havener*, 545 F.2d 9 (6th Cir. 1976). See *U. S. v. Impson*, 506 F.2d 1055 (5th Cir.) (per curiam), vacated and remanded, 422 U.S. 1031, 95 S.Ct. 2647, 45 L.Ed.2d 688 (1975), on remand, 531 F.2d 274 (5th Cir. 1976); and *U. S. v. Sharp*, 513 F.2d 786 (5th Cir. 1975), vacated and remanded, 423 U.S. 919, 96 S.Ct. 258, 46 L.Ed.2d 246 on remand, 536 F.2d 601 (5th Cir. 1976) (per curiam).

In the case at bar there was not merely a single reference to the appellant's failure to relate the exculpatory story at the pretrial hearing. As the colloquy reproduced above shows, the question was pressed to the appellant five times during the prosecutor's cross–examination of him and the purpose of the question was clearly stated by the prosecutor in that he wished to show that it was a "tale" and that his failure to relate it previously was indicative of his dishonesty and, inferentially, his guilt. Yet the prosecutor did not choose to stop here. The prosecutor inquired of several police officers as to the defendant's failure to relate the exculpatory story to them following his arrest and Miranda warnings.[4] This tactic exacerbated the error the prosecutor fell into upon his initial cross–examination of

4. "Q At any time during the course of the conversation you had with Mr. Franklin there was he ever kept from telling you any kind of–now [at this point clarification was sought on which Mr. Franklin the district attorney was referring to and it was made clear that he was referring to the defendant.]

\*     \*     \*     \*     \*     \*

"Q Was there anything that any policeman did, either yourself, under your instructions, any of those homicide officers at all that prevented Mr. Donald Gene Franklin from telling you anything he wanted to about the killing of Mary Margaret Moran?
"A No, sir; he was given plenty of opportunities.

the appellant and was additionally reprehensible in light of the fact that the prosecutor knew from the voir dire examination of the same witness during the trial–in–chief that that witness knew that an exculpatory story was related to other investigating officers outside his presence. This same witness admitted on recross–examination during the rebuttal portion of the trial that he knew that such a story had been related to other officers during the investigation of this cause. It was also known to the prosecutor from the cross–examination of one of the investigating officers that this

exculpatory story had been related to that particular officer.

A similar line of inquiry was also submitted during the rebuttal portion of the trial to the police officer who conducted the lineup examination and who admitted that he was not involved in any actual interrogation.[5]

Although the inquiries related to above were not objected to on the basis of a *Doyle v. Ohio* violation of due process, they are relevant to the determination by this Court of whether the complained of cross–examination was harmless error. Of additional

"Q Now then, let me ask you, sir, whether or not you questioned him about the presence of those bloody trousers inside the bucket inside his house?

"A Yes, sir; I did.

"Q Whenever you would question him about that, what happened?

"A He would just clam up and wouldn't say anything.

"Q Let me ask you, sir, whether you questioned him about the presence of articles that belonged to Mary Margaret Moran in his garbage can?

"A Yes, sir, I did.

"Q When you were questioning him about those items, what would he do?

"A Refuse to answer and just clamed [sic] up.

"Q Let me ask you, sir, whether you questioned him about the blood that was found on the carpet inside his house, whether or not you questioned him about the blood that was found on the carpet inside his car?

"A Yes, sir.

"Q When you asked him about that, what would he do?

"A Refuse to answer and he would clam up.

"Q Did either of the parents, either the father or the mother ever come to you and say, 'You better look for somebody else named Smokey. Our son loaned the car to him. He told us that.' Any of that story ever come to you from any source? [Objection on the basis of hearsay was sustained.]

"Q At any time during the period you were speaking to Donald Gene Franklin about this case, did Donald Gene Franklin ever tell you he was driving down the street in his Buick and saw a man he only knew as Smokey and that Smokey wanted to borrow his car and that Smokey had loaned him ten dollars to borrow his car? Did he ever tell you that?

"A No, sir; he did not.

      *      *      *      *      *      *

"Q At any point during the course of your interrogation of Donald Gene Franklin did he ever tell you that there was an individual by the name of Eugene Tealer, T–e–a–l–e–r, that he thought was Smokey?

"A No, sir.

"Q Did he ever, Donald Gene Franklin, ever offer to take you to a location where he thought he could find Smokey? Did he ever do that?

"A No, sir.

"Q Did he ever tell you he thought he knew where Smokey lived?

"A No, sir.

"Q Did he ever tell you the name of anybody, other than just Smokey? Did he ever tell you anything other than that?

"A No, sir; he didn't even tell me the name Smokey."

5. "Q At any time whenever you were with him there, during the course of conducting these lineups, did he ever tell you anything about having loaned his car to someone on the night that she disappeared for ten dollars and having loaned his pants to someone on the night that she disappeared, and having–[objection to the multiple questions–no ruling]

"Q At any time did Mr. Donald Gene Franklin tell you he had loaned his car to Smokey on that night?

"A No, sir.

"Q Was there anything–did you gag him or in any way prevent him from telling you anything he wanted to tell you?

"A No, sir.

"Q Now then, did he, at any time, tell you that he had met a man named Smokey that night and that Smokey had borrowed his car?

"A No, sir. Mr. Franklin never mentioned anything to me in reference to Mr. Smokey or anybody."

relevance to our determination of the question of harmlessness vel non, are the closing arguments of the prosecutor referring to the appellant's silence at various times following his arrest which he attempted to link up to the implausibility of the exculpatory story.

"Taken out there and left while this convicted lying rapist would have you believe that he goes and sees a man that he didn't even know his name and it wasn't known by Smokey. You heard what Lieutenant Keene said. Now, who is entitled to believe? Lieutenant Keene or this convicted lying rapist?

\* \* \* \* \* \*

"So, they bring Donald Gene Franklin's father with them. And, here is another interesting point. I had Donald Gene Franklin's father brought into the courtroom here. You know he is here in Corpus Christi, Texas. He is out there with them, with the police. Now, why did they not call Donald Gene Franklin's father to tell you that he had told the Smokey story? [Objection overruled.]

"He is right there for them to call, if they wanted to. He is there and if there is one centilla [sic] of truth in that Smokey story that Donald Gene Franklin, the step–son of the man–not his son, the step–son, told you, don't you know he would have got up here and said that. Even a step–son, blood being thicker than water, or even someone that you have raised in the capacity of a step–son, if what he had said were true, don't you know that man would have been up here testifying? Yes. We were there and Donald Gene Franklin, my step–son, told the Smokey story to him. He had loaned him the pants, told him about the ten dollars, told him he loaned him the car. Told them Smokey just left. He didn't say that. He was here and could have if he, in fact, was in a position to do so without violating an oath.

\* \* \* \* \* \*

"Now assume that he did tell them that Smokey story, and I believe that he did. He told those officers, 'I loaned my car to Smokey.' But, that is all he told them. Because, you see, he knew, driving that car, that two people out there, Mr. Carter and Mr. Galvin, are going to put him in that parking lot.

\* \* \* \* \* \*

"But, he has got to, when he testifies, account for a lot of other bits and pieces of evidence against him, too. They take him down to the police station and they talk to him. They interrogate him. By this time his mother is present. The testimony shows, as well as his father.

"Now then, if this raping–kidnapping–ten year sentence murderer had told them that Smokey story that morning don't you think that maybe his mother would have come forward and told you that? It flat did not happen. The Smokey story only came into the picture very very late in the game, you see. They talked to him that morning before they put him in any lineup.

"Now, who in the name of good sense—Now, by this time, recall that by the time he is sitting up here in the witness stand he is cool. That's right. There is no way I am going to, with my lack of ability in cross–examination of this man, I am ever going to shake his story about Smokey, if I talk to him for a week. Because he has testified before, he knows how to testify.

"MR. PRIEST: That is outside the evidence again, Your Honor.

"THE COURT: Sustain the objection to it.

"MR. CONAWAY: I thought somebody testified he had been in previous hearings. In fact, he argued he had been in previous hearings.

\* \* \* \* \* \*

"The point is, he wants you to believe he is driving down the street, sees Smokey. Smokey says, 'Let me borrow your car

and your pants and I will give you ten dollars,' and that Smokey then reappears later in the evening, checks into his house, and that is how these items got into his house.

"But, Smokey was here, if that is Smokey. They told you that they were going to call Smokey. Why didn't they do it? Because Smokey ain't going to go along with that. He is not going to take the rap for this guy's rape–murder, you see. They could have called him if they wanted to, they didn't. They could have called his mother, they didn't. They could have called his father, they didn't. *The first time that entire tale got heard by anybody is when he got up there and told it to you.*" (Emphasis added)

In conclusion, it is clear that elementary fairness was denied to this defendant by the prosecutor's attempt to impeach him with his failure to relate the exculpatory story during his testimony at pretrial hearings at which time such story was not relevant. But the majority's disposition of this ground of error would in effect open the door to prosecutors using any pretrial silence save for that following defendant's arrest and the giving of *Miranda* warnings, for impeachment purposes. The majority's disposition once again places a criminal defendant upon the horns of a dilemma when evaluating whether to pursue his Fourth Amendment rights at the pretrial stages. This Hobson's choice was erased from criminal jurisprudence in *Simmons v. U. S.,* supra, but the majority would resurrect it to once again haunt the courtrooms of this State.

Aside from the constitutional issue involved, the prosecutor's actions violated most clearly a mandatory procedural statute of this State. Article 38.08, V.A.C.C.P.[6]

Although the appellant did testify at the preliminary hearings, the prosecutor's reference to his failure to relate the exculpatory story was clearly a comment upon the appellant's invocation of his Fifth Amendment rights as accorded him through the Fourteenth Amendment to the United States Constitution and *Simmons v. U. S.,* supra. The prosecutor's questions were clearly designed to comment upon appellant's failure to testify to specific yet irrelevant facts. A similar line of inquiry was found to be reversible error in *Scroggins v. State,* 97 Tex.Cr.R. 573, 263 S.W. 303. This Court construed Article 790, C.C.P.[7] to apply not only to comments on the defendant's failure to testify at his trial but also his failure to testify at any pretrial proceedings. During cross–examination of the defendant in *Scroggins,* the prosecutor asked if the defendant was testifying for the first time to which he affirmatively responded. The objection to the question and answer was sustained, yet the prosecutor continued by asking "When they had an examining trial at Malakoff, were you suffering from lockjaw or any impediment to your speech?" The objection was sustained, but the prosecutor pursued by asking, "Why didn't you tell the court up there at that examining trial what you have told the jury here?" Each objection to these questions was sustained, yet this Court construed it as reversible error. The principle of Article 38.08, V.A.C.C.P., and its predecessor, to protect defendants when they invoke their Fifth Amendment rights against self–incrimination, apply just as readily to the case at bar

6. Article 38.08, V.A.C.C.P., provides:
"Any defendant in a criminal action shall be permitted to testify in his own behalf therein, but the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause."

7. "Any defendant in a criminal action shall be permitted to testify in his own behalf therein, but the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause; provided, that where there are two or more persons jointly charged or indicted, and a severance is had, the privilege of testifying shall be extended only to the person on trial."
As noted in the special commentary to Article 38.08, V.A.C.C.P., only the proviso of the preceding Article 790 was stricken in the reenactment of Article 38.08 in 1965.

notwithstanding the fact that appellant actually testified at the pretrial hearings. As repeatedly noted above, he had a right not to incriminate himself on matters necessary to the disposition of his Fourth Amendment issue nor collateral and irrelevant issues. Thus, the questions propounded by the prosecutor during his cross–examination were clearly a comment upon appellant's failure to testify to matters beyond the scope of the pretrial hearings.[8] See Article I, Sec. 10, Texas Constitution; *Dudley v. State*, 548 S.W.2d 706 (Tex.Cr.App.).

Finding the error involved in appellant's Grounds of Error 19, 20, and 21 to violate fundamental notions of fairness, defend-

ant's right to due process and due course of law, a mandatory State statute, and that the error cannot be considered harmless beyond a reasonable doubt, I must dissent from the majority's disposition of these issues.

### II

The majority disposes of appellant's ground of error number seven regarding venireperson Askey's disqualification as a juror by selectively quoting excerpts from the voir dire examination and concluding that she was disqualified under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).[9]

---

8. When a defendant takes the stand to testify in his trial,

"... He may be contradicted, impeached, discredited attacked, sustained, bolstered up, made to give evidence against himself, cross–examined as to new matter, and treated in every respect as any other witness testifying in behalf of defendant, except where some statute forbids certain matters to be used against him, such as proof of his conviction on a former trial of the present case, *his failure to testify on a former trial or a hearing*, and the like . . . ." (Emphasis added.) 1 Branch's Ann.Penal Code, 2nd Edition, Sec. 168, p. 170.

9. "THE COURT: Mrs. Askey–

"MR. TINKER: Your Honor, it is difficult to hear. I just want to remind the Court it is–when this Court talks to the witness it is difficult to hear.

"THE COURT: Under the law whenever you are brought up here as a juror in a capital case it is my duty to ask you a question in the beginning to be sure that you understand the question. The Texas legislature passed a statute that says no person is qualified to serve as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not effect [sic] his deliberation on any issue of fact. What I construe that to mean is this: In any case in which a man is charged with a capital offense–in this case the defendant is charged with capital murder–there are basically two possible punishments in that case. If he is found guilty the possible punishments are death or imprisonment for life. That is all the punishment that is involved. And, the question is the statute assumes that you are going to know that when we start, you see? And, if you are selected as a juror you are

going to have to look at all the issues in the case and go through all the issues in the case and decide what the facts are in the case and what exactly occurred in the case.

"Now, would the fact you knew what the punishment was or what the punishment could be, would that effect [sic] you in your deliberations on the facts in the case?

"JUROR: You said would it effect [sic] me?

"THE COURT: Yes, sir.

"JUROR: No, it won't.

"THE COURT: All right. Go ahead.

"MR. CONAWAY: Thank you, sir.

"QUESTIONS BY MR. CONAWAY:

"Q Let's see, Mrs. Askey, the question that the Judge posed to you is required to be asked of everybody that is about to be qualified or talked to in terms of jury service. And, he asked you that question for that reason. And, it touched somewhat on your feelings about the death penalty because he asked if the knowledge of the death penalty coming into play in a case like this, a capital murder case, whether that knowledge, that is the idea of the punishment being limited to either death or life, life or death, those are the limited punishments for someone convicted of capital murder–the Court asked if that would influence you in fact determinations if you served as a juror and you said it would not; is that correct?

"A No audible answer.

"Q And, if you would, this gentleman here with this machine is taking down everything everybody says in connection with this, and if you nod your head even though you nod your head affirmatively and I understand it, he just puts nodded head and so if you speak out so that he can effect on the record there what it is that you said it will make the record a whole lot clearer.

"I will ask you a little more about your feelings about the death penalty. Have you given it any thought at all since you knew from Tuesday, this being Thursday, that this was a capital murder case? The indictment charges that the defendant with capital murder. You have had at least since Tuesday until now to think about that aspect of it. So, let me ask you whether or not you have any conscientious scruples against the infliction of death as punishment for crime?

"A  I don't believe in capital punishment.

"Q  All right.

"A  Is that the question?

"Q  The words that I used are ones that are required by law, not my choice at all. In fact, if it were up to me I would use simply these words, I would ask you, how do you feel about the death penalty, are you for it or against it? That is the way people usually think about it.

"A  I am against it.

"Q  All right. Now, is that based on--What is your religious preference?

"A  Methodist.

"Q  Are you active in your church?

"A  Yes, I am.

"Q  Do you attend regularly and do you go to the extent, maybe, of teaching Sunday School or are you an officer in the church or anything or [sic] that nature?

"A  No, I just belong to the women's society of christian service.

"Q  And is it a feeling that you have had for some time, that is all your life, that it is not proper to punish someone by taking his life regardless of what he might have done, no matter what his crime might have been? Is it your feeling taking someone's life should be left to God and not men or women?

"A  I believe they should be punished, you know, go to prison or, you know,-

"Q  Right.

"A  Some kind of punishment.

"Q  Some sort of punishment, certainly.

"A  Uh huh.

"Q  If someone commits a crime he should be punished but if I understood your statement to me it was that you are opposed to the death penalty and you don't go alone [sic] with punishing somebody that strong. Is that what you are telling me?

"A  Well, I just don't believe in it.

"Q  You don't believe in the death penalty, is that it?

"A  Yes, sir.

"Q  Is that a feeling that you have had for a long time?

"A  Yes, sir; it is.

"Q  Could you, under no circumstances, see yourself sitting on the jury and hearing evidence in a case, a capital murder case, listening to the evidence and hearing that somebody had committed a crime, a terrible crime, and knowing by your participation in the trial that the persons on trial might be put to death, could you ever do that in keeping with your own religious beliefs and in keeping with your conscience?

"A  I don't know. I guess--it is not my religious belief. I guess it is my conscience, I guess. I just believe in punishing them.

"THE COURT: She believes in punishing but she says she doesn't believe in the death penalty. She said it three times.

"QUESTIONS BY MR. CONAWAY:

"Q  Your feeling is you don't object to punishment short of death but you are opposed to the death penalty?

"MR. WHITE: Against it.

"MR. CONAWAY: You are against the death penalty?

"JUROR: Yes, I am.

"QUESTIONS BY MR. CONAWAY:

"Q  You are definitely against it, there is no question in your mind about that?

"A  Yes, sir; I sure am.

"MR. CONAWAY: Thank you, ma'am. We will challenge for cause, Your Honor.

"MR. TINKER: May I ask some questions, Your Honor?

"THE COURT: Yes, sir.

"QUESTIONS BY MR. TINKER:

"Q  Mrs. Askey, first, in a capital case you will be called upon, if you are selected on the jury, to decide the facts and conclude whether or not the person on trial is guilty or not guilty. Okay? We start out with that.

"A  Yes.

"Q  You don't have to worry about the death penalty at that time, you are just trying to decide the fact about whether the person is guilty of [sic] not guilty.

"MR. CONAWAY: I will object to this line of inquiry. I take it he has the prospective juror on voir dire for the purpose of rehabilitating her in light of the Court's sustaining my challenge for cause. Now, to recite to her

"THE COURT: That is the purpose, Counsel. So, try to direct it to that issue.

"MR. TINKER: Your Honor, my intentions

"THE COURT: Okay, Let's get with it.

"MR. TINKER: Sir?

"THE COURT: Let's go.

"MR. TINKER: The question, as I understand it, is whether or not it will effect [sic] her deliberations on any issue of fact.

"THE COURT: You are asking her about--I don't understand you are directing it at that but let's proceed.

"MR. TINKER: I promise, Your Honor, that is what I am trying to get at.

"THE COURT: Well, let's go.

"QUESTIONS BY MR. TINKER:

"Q  So, you find the person guilty or not guilty based upon the facts you hear, first. Okay?

"A Uh huh. Yes.

"Q In any kind of capital murder case or any kind of murder case. Okay. Then, there will be a second hearing in which you, as a juror, would be called upon to answer, if you found the individual guilty of capital murder, then you would be called upon to answer two questions, either answer the questions yes or no. And, one of them, generally, would say whether or not the person who you had found guilty had committed the murder deliberately and with the expectation that death would result and you and the other jurors would be called upon to answer that question based upon the evidence, yes or no. After you answered that question you would be called upon to answer an additional question and that is whether or not there is a probability that the person you had found guilty is likely to commit crimes of violence in the future which will cause that individual to be a continuing danger to society. And, you would be called upon to answer that question yes or no depending upon how you felt the facts caused you to answer it. Okay?

"Now, you don't have to vote whether or not the person gets the death penalty or does not get the death penalty. All you will be called upon to do is to answer the questions. Okay?

"A Yes.

"Q You understand that?

"A Yes, sir.

"Q All right. Now, under those circumstances the law then would determine, depending on your answers, whether or not the person got the death penalty or got life in the penatentiary [sic]. And, it would be the law that would either cause the death penalty or not and not you as a juror. Do you understand what I am saying to you?

"A Yes.

"Q Under those circumstances, then, could you listen to the facts in the case and determine whether the individual was guilty of capital murder or not guilty of capital murder without being effected [sic] in that decision by the fact that the law might impose the death penalty?

"A I wouldn't know.

"Q I am sorry, ma'am?

"A I said I don't know.

"Q You don't know whether it would effect [sic] you or not in making the determination whether or not the individual is guilty?

"A I wouldn't know whether he was guilty or not. I wouldn't know.

"Q All right. What I am getting at is you understand that you, as a juror, would not be called upon to say, 'Yes, I think this person ought to get the death penalty,' or should not get the death penalty. All you have to do is decide what the facts are in this case. Do you follow me that far?

"A I think I do.

"Q Okay. Now, in deciding what the facts are can you do that without worrying about whether or not the punishment might be death or life in the penitentiary? Do you think you can consider the facts and decide about the facts without being effected [sic] by the fact that there is a possibility that the sentence will be life or death?

"A I think the sentence would be life.

"Q Okay. But, in deciding about the facts could you disregard the possible punishment of life or death in deciding whether the person is guilty? Could you decide guilty without worrying about what the punishment might be?

"A Yes, I could.

"Q And then in answering these two questions that I mentioned to you, after you found an individual guilty, could you answer those questions and decide the fact answers to those questions without worrying what the punishment might be, because the law would assess the punishment, depending upon your answers?

"A Yes, I could.

"Q You could answer those questions of fact without being effected [sic] by the fact that the death penalty might result or the life sentence might result, depending on your answers? You could do that?

"A Yes, sir.

"MR. TINKER: Your Honor, I hold she is qualified under our law.

"The COURT: I think she is disqualified. You can go back to the central jury room. He will explain to you where to go.

"MR. TINKER: Mrs. Askey, you are excused. Are you related to Douglas?

"JUROR EXCUSED.

"MR. TINKER: Your Honor, at this time I do want to object to Mrs. Askey being excused and would show the court she is qualified under the statutes and said she would not be effected [sic] both in answers to the questions by the Court and in answers to the questions by me, that she would not be effected [sic] in her determination of issues of fact. Further, I object because the–our client has the right to have a cross section of the community serve on his jury and that, of course, includes those folks who do not believe in the death penalty.

"Your Honor, may the record further reflect that this lady was black.

"THE COURT: Yes, sir. Overruled.

"MR. TINKER: Does the record reflect that, Your Honor.

"THE COURT: I don't think it does but I will let it reflect that."

The *Witherspoon* decision was founded on the rationale:

"Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen [sic] for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected." 391 U.S. at Page 521, 88 S.Ct. at Page 1776–1777.

Consequently, a defendant is entitled to a jury which represents an impartial cross section of the community. In any given community there will be people opposed to the death penalty. Many of those people will be able to follow the law and decide a case based on the evidence presented and would not *automatically* vote against the imposition of the death penalty. This is not to say that those individuals may not consider their feelings towards the death penalty; but as long as they will be able to consider the death penalty and be able to evaluate the evidence presented, even in light of their opposition to such penalty, those people will be qualified under the *Witherspoon* test. *Boulden v. Holman*, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); *Maxwell v. Bishop*, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970); *Grider v. State*, 468 S.W.2d 393 (Tex.Cr.App.).

As stated by the United States Supreme Court in *Witherspoon* :

"Unless a venireman [sic] states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position." 391 U.S. at Page 515, Footnote 9, 88 S.Ct. at Page 1773, Footnote 9.

The court in *Witherspoon* further stated that the only venirepersons who could be excluded for cause:

". . . were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*" U.S. at Page 522, Footnote 21, 88 S.Ct. at Page 1777, Footnote 21.

It is clear from the reproduced voir dire of venireperson Askey that she would not "automatically vote against the imposition of capital punishment without regard to any evidence" or would be biased in determining the defendant's guilt. Thus, her exclusion was in direct violation of the mandate of *Witherspoon v. Illinois*, supra, and constitutes reversible error. Even the exclusion of one venireperson in violation of *Witherspoon v. Illinois*, constitutes reversible error. See *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 399 (1976).

For the foregoing reasons, both individually and together, I dissent from the majority's disposition of this cause.

ONION, P. J., and ROBERTS, J., join in this dissent.

Before the court en banc.

## OPINION ON APPELLANT'S MOTION FOR REHEARING

ODOM, Judge.

This is an appeal from a conviction for capital murder in which the punishment, following the jury's affirmative answers to questions submitted under Art. 37.071, V.A. C.C.P., was fixed at death. Trial was held in Nueces County on a change of venue from Bexar County.

Appellant's motion for leave to file motion for rehearing was granted in this case so that this Court could reconsider his 19th, 20th and 21st grounds of error, in which complaint is raised to the trial court's rulings allowing the state to cross–examine him regarding his failure to testify at pre-

trial hearings about the exculpatory matters to which he testified at trial. The grounds of error assert that this cross–examination improperly showed his failure to testify and used against him his post–arrest and pretrial silence and the exercise of his rights under the Fifth Amendment to the United States Constitution.

This is the cross–examination to which the grounds of error are directed, together with the objections and rulings:

"Q. Isn't it true that you have been under oath in a Courtroom before Judge Barlow in previous proceedings and you never told us one mumbling word about that tale you just told us?

"MR. PRIEST: We will object to that question. As your Honor knows we were then engaged in pretrial matters in which these matters were not relevant and we object to the question on that basis.

"THE COURT: Well, I will sustain the objection to it.

"MR. CONAWAY: I think I am entitled to show that he has had opportunity under oath to offer that tale before and he did not do so, Judge.

"MR. PRIEST: We object, Your Honor.

"MR. CONAWAY: At a time whenever he waived his Fifth Amendment rights and took the stand.

"THE COURT: The problem is—

"MR. CONAWAY: I recognize his problem.

"MR. PRIEST: Object to the last statement of Counsel.

"THE COURT: The problem is this, I try cases one after another. I have Court records of what occurs in Court and, the truth is, I don't remember all the time, what the issues were or what was involved.

"MR. CONAWAY: My question is does he remember it, Judge. Do you remember taking the witness stand in San Antonio, Texas?

"MR. PRIEST: He is repeating the very question we objected to and we request a ruling.

"THE COURT: What is the question?

QUESTIONS BY MR. CONAWAY:

"Q. Do you remember taking the witness stand, Donald Franklin, in San Antonio, Texas, before this same Judge, James E. Barlow; me asking you questions, Mr. Priest being present, this same Court Reporter being present in the Courtroom and me asking you questions about what happened out there at that house and did you say one word about Eugene Tealer or anybody being in that house or—

"MR. PRIEST: Don't say a word until the Judge rules. It is our position he is making undue comments on the exercise of the Fifth Amendment privilege. We ask the Court to–first, we object to the question.

"THE COURT: All right. It is overruled.

"MR. PRIEST: Please note our exception.

QUESTIONS BY MR. CONAWAY:

"Q. Did you say one mumbling word about Eugene Tealer swapped pants with you, Eugene Tealer came and set fire to that poor woman's purse, did you say one word about never having seen that knife before, did you say one word about loaning that car to Eugene Tealer in open Court under oath before this same Judge in San Antonio, Texas? Did you say one word at all?

"MR. PRIEST: If it please the Court, he was not asked any of those questions.

"MR. CONAWAY: That wasn't the question. Did you–you could have told that tale down there and you chose not to, didn't you?

"MR. TINKER: Your Honor, there was a hearing in this Court for a specific purpose that had nothing to do with what he may or may not have said. The Court, in my opinion, is committing error in allowing this kind of interrogation to go on. The first reason you have pretrial proceedings is because they are supposed to be done prior to getting into anything

in the presence of the jury. This witness was not asked this question. In fact, this Court specifically would not permit that kind of question of this man.

"MR. CONAWAY: He wasn't there.

"MR. TINKER: I have read the record, Your Honor. It is here and I will offer it to the Court.

"THE COURT: We are no longer in pretrial, Counsel. The objection is overruled.

"MR. TINKER: Let me make a tender of the Court's ruling at that time.

"THE COURT: The point is, in pretrial you are bound by certain rules that do not necessarily apply before the jury.

"MR. TINKER: That's right. And at pretrial you ruled you would not permit him to answer questions. Now, he is trying to make it look like this man tried to disquise (sic) or hide something because you ruled that he could not testify about it. Now—and I offer, Your Honor, the Court Reporter's notes from that proceedings. It was your ruling that prevented him from testifying.

"THE COURT: All right.

"MR. TINKER: Your Honor, also, we request a mistrial at this time because of what has already occurred and I reurge the Court to look at the Statement of Facts and see the Court's ruling at that time, which did not permit him to testify to these facts.

"THE COURT: Objection overruled. Motion for mistrial overruled. Go ahead, Counsel.

QUESTIONS BY MR. CONAWAY:

"Q. Now, then, my question, again, I don't think you ever did answer it, was did you ever tell—you had the opportunity sitting on the witness stand in a different Courtroom, same Judge, same defense lawyer,—at least well, two of them, Mr. Williams and Mr. Priest were there, I was there, Judge Barlow was there and you were certainly there and we were talking about what happened out there at your house on the morning when you were arrested. Do you remember that?

"A. Yes, sir.

"Q. All right. And I was asking you, specifically, questions about what happened out there at the house on the morning you were arrested. Do you remember that?

"A. Yes, sir. I do.

"Q. Now then, do you remember telling me anything about, 'I loaned my pants to Eugene Tealer?' Did you tell me anything like that?

"A. I only answered the questions that you asked me. I did tell them at the time that they arrested me, the same thing I have just finished stating."

There were three occasions at which appellant gave testimony at pretrial hearings. On the first occasion appellant testified regarding his inability to appear as a witness at that time due to his temporarily impaired mental alertness resulting from medication he had been given the day before. When called to testify at that time the following occurred:

"[Defense counsel]: I would like to make some proof on the question of whether he is competent.

"THE COURT: All right. Are you ready?

"[Defense]: I would like to put him on the stand for that purpose and I would like it clearly understood he is being put on the stand for that purpose and no other.

"THE COURT: All right."

Later during that hearing the trial court sustained a defense objection to a question put to appellant by the prosecutor with the comment, "he took the stand for limited purpose and up until two or three years ago you couldn't do that but, the Court holds you now can take the stand for a definite purpose."

The second pretrial hearing at which appellant testified was on his motion to suppress the fruits of a search and seizure

because he did not voluntarily and knowingly sign the consent to search form pursuant to which the search was conducted. When appellant was called at that hearing the following occurred:

"[Defense counsel]: Your Honor, I want to call the defendant to the stand for the purposes of the motion only. But, before I do I would reurge to the Court the motion we have previously filed to restrict the cross examination of the defendant by the State to matters brought out on direct having bearing on the motion to suppress and nothing else.

"THE COURT: I think the case law holds if he takes the stand he can take the stand on the motion to suppress for limited purposes relating to the motion itself. So, I assume that is what you are relating it to.

"[Defense counsel]: That is correct, Your Honor."

During the course of this hearing the trial court sustained at least fourteen defense objections that the prosecutor's questions on cross–examination of appellant were outside the scope of the hearing or irrelevant to the proceeding.

Appellant's third pretrial appearance as a witness came during a hearing on the admissibility of identification testimony the State intended to present at trial. When appellant was called his attorney announced, "Your Honor, again, we will call the defendant for the limited purpose of this motion and his rights to counsel [at the line–up identification] and the issues surrounding that question." Twice during this hearing objections to state questions outside the scope of the hearing were sustained.

On original submission of this case the majority reviewed a number of cases that discussed various rules allowing and prohibiting impeachment of a witness with various types of evidence obtained under various circumstances. After demonstrating that none of the United States Supreme Court opinions discussed there were precisely on point, the majority tied in its conclu-

sion on the issue with its opening proposition on the subject. Omitting the intervening discussion, which was primarily directed to dispelling the possibility that constitutional principles were violated, the court on original submission decided the issue in this fashion:

"It is a general rule of evidence that the prior silence of a witness as to a fact to which he has testified, where such silence occurred under circumstances in which he would be expected to speak out, may be used to impeach the witness during cross–examination . . .

"When the appellant testified for limited purposes at the pretrial hearings the State was properly restricted in its interrogation and cross–examination of the appellant, but the appellant in those hearings was free to testify to, and had the opportunity to testify to, the same exculpatory version of the facts as he later did before the jury. We hold the trial court did not err in permitting the State to cross–examine appellant before the jury as to why he had not related his exculpatory version of the facts in the pretrial hearings."

Upon reconsideration we have decided that our original opinion was incorrect, both on state evidentiary grounds and on constitutional grounds.

■ The general rule first quoted above allows impeachment by showing the witness's prior silence "where such silence occurred under circumstances in which he would be *expected to speak out.*" (Emphasis added.) Such a rule does not authorize impeachment by showing appellant's silence, as at the hearings here, when he "was free to testify" and "had the opportunity to testify." Merely having the opportunity to say something does not constitute circumstances in which one would be *expected to speak out.* At the pretrial hearings in this case appellant expressly took the stand, with the trial court's permission, for a limited purpose. It cannot be said

that testifying at a hearing conducted on issues with respect to which appellant's trial testimony would not be relevant presents a situation with circumstances in which appellant would have been expected to speak out on the subject matter of his subsequent trial testimony. Appellant's pretrial hearing silence on the subject was not admissible under the general rule for impeachment relied on in disposing of this issue on original submission.

In this case, appellant's silence about his exculpatory story not only was under circumstances that did not give rise to the impeachment rule discussed above; it was also grounded on an exercise of his constitutional privilege against self–incrimination.

■ In *Simmons v. United States,* 390 U.S. 377, 393–4, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247, the Supreme Court wrote:

"A defendant is 'compelled' to testify in support of a motion to suppress only in the sense that if he refrains from testifying he will have to forego a benefit, and testimony is not always involuntary as a matter of law simply because it is given to obtain a benefit. However, the assumption which underlies this reasoning is that the defendant has a choice: he may refuse to testify and give up the benefit. When this assumption is applied to a situation in which the 'benefit' to be gained is that afforded by another provision of the Bill of Rights, an undeniable tension is created. Thus, in this case Garrett was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self–incrimination. In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another."

Although the Court there was addressing the use of evidence given at such a hearing against a defendant at his trial on the issue of guilt, avoidance of the impermissible "tension" created when forced to choose between assertion of constitutional rights is the basis for allowing a defendant to testify for a limited purpose, such as appellant did at the pretrial hearings here, without waiving his Fifth Amendment privilege. It is clear that appellant testified at his pretrial hearings in order to assert constitutional rights regarding the lawfulness of a search and seizure of evidence to be used against him, and regarding the line–up identification procedures used in his case. His choice to take the stand for those limited purposes served to avoid the impermissible "tension" between the assertion of those rights and assertion of his privilege against self–incrimination that *Simmons* prohibited. Consequently, his failure to testify at those hearings beyond their proper scope, and his failure to testify regarding the facts of the case generally, necessarily constituted an assertion of and reliance on his constitutional privilege against self–incrimination.

■ In *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, n.10, 49 L.Ed.2d 91, n. 10, the Court said:

"After an arrested person is formally advised by an officer of the law that he has a right to remain silent, the unfairness occurs when the prosecution, in the presence of the jury, is allowed to undertake impeachment on the basis of what may be the exercise of that right."

If it is impermissible to allow impeachment on a post–arrest silence that *may* be an exercise of one's right to remain silent, to allow impeachment for what clearly is an exercise of the constitutional privilege against self–incrimination, as was done in this case, can be no less erroneous. Although this form of impeachment is not a comment on the failure to testify *at trial,* it clearly is a comment on the accused's exercise of his constitutional privilege against self–incrimination. See, *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106; Amendments V and XIV, United States Constitution; Article 1, Section 10, Texas Constitution.

In addition to the state and federal grounds for reversal discussed above, there is another state ground that prohibited comment on appellant's failure to testify at the pretrial hearings about the exculpatory matters to which he testified at trial. Article 38.08, V.A.C.C.P., provides:

"Any defendant in a criminal action shall be permitted to testify in his own behalf therein, but the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause."

The predecessor to this article (Art. 790, C.C.P.1925) has been held applicable to pretrial hearings. *Scroggins v. State*, 97 Tex. Cr.R. 573, 263 S.W. 303. The purpose of the statute is to provide express protection to defendants when they invoke their constitutional rights against self–incrimination. As stated previously in this opinion, appellant's silence about his exculpatory story was grounded on his exercise of those constitutional rights. Accordingly, we hold that Article 38.08, supra, also applies to a defendant's silence on some matters at a pretrial hearing even when he does testify at that hearing about other matters.

We hold the state's impeachment of appellant on the basis of his failure to testify to his exculpatory story at the pretrial hearings was improper for all of the reasons set out in Part I of the dissenting opinion on original submission. Specifically, we hold that the impeachment was improper under state law because it was in violation of Art. 38.08, supra, and also because it was not authorized by the rule allowing evidence of a witness's silence under circumstances in which he would be expected to speak out. We also hold the state's use of that circumstance was an improper use of his pretrial silence and his exercise of his privilege against self–incrimination under the Fifth

and Fourteenth Amendments to the United States Constitution, and under Article 1, Section 10 of the Texas Constitution.

Accordingly, appellant's motion for rehearing is granted, the judgment is reversed, and the cause is remanded.

CLINTON, J., not participating.

ONION, Presiding Judge, concurring on appellant's motion for rehearing.

The question presented by this appeal is whether a defendant in a criminal case may be impeached as a witness at the trial on the merits by his silence as a witness at pre–trial hearings about his defense of alibi [1] when he was called to testify for the limited purpose of those hearings in accordance with the trial court's rulings.

Appellant testified at the pre–trial hearing to determine his competency to stand trial. He testified again in hearings on motions to suppress evidence of a search and seizure and to suppress a possible future in–court identification which he claimed was tainted. He was expressly called as a witness for the limited purpose of each hearing under the correct rulings of the trial judge. He was not expected to speak out about any defense of alibi or other defensive matter which was totally irrelevant to any issue before the court on the pre–trial hearings. Such defensive matters were clearly outside the scope of the pre–trial hearings.

At the trial on the merits, the appellant testified, among other things, in connection with his defense of alibi that he had loaned his Buick automobile and a pair of pants to a Eugene Tealer on the night in question and that Tealer around 1 a. m. on July 26, 1975 returned the same and that Tealer had placed the pants in a pail of water saying he had thrown up on the pants. Appellant claimed he was not at the scene of the crime.

---

1. The other opinions refer simply to "exculpatory matters" testified to by appellant but the same was part and parcel of his alibi defense, and the holding is far better understood when it

is clear that the prosecutor was asking why he hadn't produced his defense at the earlier hearings.

On cross–examination the prosecutor, who had represented the State at the pre–trial hearings and knew that the appellant had been called for the limited purpose of the hearings, elicited, over vigorous objections, from the appellant he had testified in court under oath before the same judge and had never revealed his "tale"–his defense of alibi. The defense counsel did what they could to prevent the error, calling the trial court's attention to its earlier pre–trial rulings limiting the scope of such pre–trial hearings, which were correct, pointing out to the court that error would occur if the court permitted the State to impeach the appellant before the jury with his silence as to his alibi defense at the pre–trial hearings when the defense of alibi was not relevant to any issue before the court at the pre–trial hearings. Nevertheless, the trial court permitted such impeachment.

This is the condition in which the record of the trial below reached this court. Given the facts of this brutal, heinous crime, it is difficult to understand why the prosecutor chose to engage in such highly questionable conduct and insisted on impeaching the appellant, and why the trial judge, despite his pre–trial rulings, permitted such impeachment, endangering the conviction on appeal.

It may be argued that the jury was not likely to believe appellant's defense of alibi, but he was entitled to have that defense presented to the jury without the inference that he had testified at earlier court hearings under oath, had an obligation to speak out, had an opportunity to do so and yet failed to relate his alibi defense. The implication was that his testimony was being advanced for the first time under oath before the jury although he had the opportunity to do so in previous court appearances. Recent fabrication was the theme of the prosecutor's interrogation. The majority on appellant's motion for rehearing reverses the conviction. I concur.

It may be that this court's ruling on rehearing will be better understood if the background of the law as it has developed over the recent years is mentioned.

Under our former Code of Criminal Procedure, it was said that "[w]hen defendant takes the stand as a witness he is subject to the same rules as any other witness. He may be contradicted, impeached, discredited, attacked, sustained, bolstered up, made to give evidence against himself, cross–examined as to new matter, and treated in every respect as any other witness testifying in behalf of defendant, except where some statute forbids certain matters to be used against him, such as proof of his conviction on a former trial of the present case, *his failure to testify on a former trial or hearing, and the like.*" 1 Branch's Ann. P.C., 2nd ed., § 168, p. 170, and cases there cited. (Emphasis supplied.) See also *Shelton v. State*, 397 S.W.2d 850 (Tex.Cr.App. 1965); Texas Law of Evidence, McCormick and Ray, 2nd ed., § 443, p. 381; 62 Tex. Jur.2d, Witnesses, § 205, p. 130; 98 C.J.S. Witnesses § 369, p. 121; § 370, p. 123. Thus, when an accused voluntarily took the witness stand he subjected himself to any legitimate cross–examination within the rules of evidence, any relevant inquiries about the charge against him.

And it was consistently held for many years that an accused may not take the witness stand for a limited purpose. *Perez v. State*, 170 Tex.Cr.R. 586, 343 S.W.2d 256 (1961); *Robinson v. State*, 163 Tex.Cr.R. 499, 293 S.W.2d 781 (1956); *Tyler v. State*, 163 Tex.Cr.R. 441, 293 S.W.2d 775 (1956); *Holder v. State*, 140 Tex.Cr.R. 55, 143 S.W.2d 613 (1940); *Gonzales v. State*, 160 Tex.Cr.R. 548, 272 S.W.2d 524 (1954); *Rubens v. State*, 166 Tex.Cr.R. 71, 311 S.W.2d 242 (1958); 62 Tex.Jur.2d, Witnesses, § 210, p. 140.

In *Gonzales* and *Rubens*, it was particularly established that an accused may not be permitted to take the stand for the single and limited purpose of testifying that his extrajudicial confession was not a voluntary one.

It must be remembered that when these cases were decided we had little or no pre–trial hearing evidence in this state. A mo-

tion to suppress evidence was not recognized. There were, of course, examining trials and habeas corpus hearings to reduce bail, etc.

Under the influence of *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964),[2] this court in *Lopez v. State*, 384 S.W.2d 345 (Tex.Cr.App.1964), overruling *Gonzales* and *Rubens* sub silentio, held that an accused might testify for a limited purpose in a hearing conducted in the absence of the jury to determine the voluntariness of the confession. There the court said:

"Should the defendant testify at such a hearing, the cross–examination of the defendant shall be limited solely to the facts surrounding the voluntariness of the confession, and the defendant shall not be subject to cross–examination except for the limited purpose of facts involving the voluntary nature of his confession, nor shall the defendant be compelled to take the stand upon the trial of the cause upon its merits because of his testimony at this hearing."

In *Masters v. State*, 545 S.W.2d 180 (Tex. Cr.App.1977), it was held that the court reversibly erred in refusing to allow the defendant to take the stand for the limited purpose of testifying on the voluntariness of his confession in a separate hearing in the absence of the jury. See Article 38.22, V.A.C.C.P.

With the advent of the 1965 Code of Criminal Procedure, Article 28.01, V.A.C. C.P., provided for pre–trial hearing procedures including a motion to suppress evidence. See *Bosley v. State*, 414 S.W.2d 468 (Tex.Cr.App.1967).

It became common for the voluntariness of a confession to be challenged by a pre–trial motion to suppress rather than to delay a trial in progress by holding a hearing in the absence of the jury on the voluntariness and admissibility of the confession as mandated by *Jackson v. Denno*, supra.

In *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court of the United States ruled that testimony of a defendant in support of a motion to suppress evidence on Fourth Amendment grounds may not thereafter be admitted against him at trial on the issue of guilt. The basis of the Supreme Court's ruling was that otherwise the defendant would be put to the choice of asserting his Fourth Amendment claim or exercising his Fifth Amendment privilege against self–incrimination.

Thus, where the defendant has a right to an evidentiary hearing on a motion to suppress evidence, he may take the stand and limit his waiver of his privilege against self–incrimination to that hearing. See *Bailey v. United States*, 128 U.S.App.D.C. 354, 389 F.2d 305 (1967). Cf. *Brumfield v. State*, 445 S.W.2d 732 (Tex.Cr.App.1969).

In *Martinez v. State*, 437 S.W.2d 842 (Tex.Cr.App.1969), following the dictates of *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), it was held that once in–court identification of the accused is sought to be introduced and the court is apprised that identification is questioned on the basis of a prior police station or lineup identification, then upon motion of defense a hearing should be held outside the presence of the jury, and should the court determine that such identification at the police station or elsewhere was violative of the United States Supreme Court mandates or of due process, then the prosecution is precluded from offering any evidence of such identification before the jury.

Here again, as with hearings to determine the voluntariness of a confession, a hearing on a pre–trial motion to suppress evidence became the accepted procedure to determine whether the in–court identification was tainted, and the defendant is often called as a witness for the limited purpose of the hearing with the understanding that his testimony at such hearing could not be

2. See footnote 16 in *Jackson v. Denno*, supra.

used against him at the trial on the merits, and that by so testifying at said hearing he did not waive his Fifth Amendment privilege against self–incrimination at the trial on the merits.

Much, much more could be written about the pre–trial hearing practice and a defendant taking the stand for a limited purpose, but the above should serve as a guide for understanding of the practice.

Article 38.08, V.A.C.C.P., provides:

"Any defendant in a criminal action shall be permitted to testify in his own behalf therein, but the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the case."

The forerunners of the statute have also provided the same.

It has long been held that the inhibition of the statute was not limited or restricted to the pending trial but includes the failure of the defendant to testify at a former trial. *Richardson v. State*, 33 Tex.Cr.R. 518, 27 S.W. 139 (1894); *Wilson v. State*, 54 Tex. Cr.R. 505, 113 S.W. 529 (1908); *Hare v. State*, 56 Tex.Cr.R. 6, 118 S.W. 544 (1909); *Brown v. State*, 57 Tex.Cr.R. 269, 122 S.W. 565 (1909); *White v. State*, 83 Tex.Cr.R. 252, 202 S.W. 737 (1918); *Lee v. State*, 165 Tex.Cr.R. 113, 303 S.W.2d 406 (1957).

It was held error to permit the State, for the purpose of discrediting the defendant's story, as being of recent fabrication, a defense brought out for the first time on the second trial and defendant's examination, to show that the defendant did not testify at the former trial. *Dorrs v. State*, 40 S.W. 311 (Tex.Cr.App.1897).[3]

It has also been held improper for the district attorney to ask the accused whether he testified at a hearing on habeas corpus, since he had the right to testify or not at such hearing, as he saw proper, and his failure to so do was not a circumstance against him. *Swilley v. State*, 73 Tex.Cr.R. 619, 166 S.W. 733 (1914); *Scroggins v. State*, 97 Tex.Cr.R. 573, 263 S.W. 303 (1924). Further, it has been held that reference to the accused's failure to testify in an examining trial was erroneous on the trial on the merits. *Hays v. State*, 101 Tex.Cr.R. 162, 274 S.W. 579 (1925); *Scroggins v. State*, supra, and cases there cited.

It is clear from the more recent cases that if a defendant takes the stand on a pre–trial motion to suppress evidence of a search and seizure, such as the appellant did in the instant case, his testimony at the pre–trial hearing cannot be used against him even if he takes the stand as a witness at the trial on the merits. *Simmons v. United States*, supra. Further, if he does not testify at a former trial or a pre–trial hearing, his silence cannot be used against him at the trial on the merits. Article 38.08, supra.

In the instant case, the appellant testified at three pre–trial hearings including a mo-

---

**3.** The dissenting opinion on rehearing cites *Sanders v. State*, 52 Tex.Cr.R. 156, 105 S.W. 803 (1907). *Sanders* held that where three prosecutions grew out of sales from the same case of liquor and on the trial of the first two cases accused did not take the stand to dispute the witness Rountree who testified accused made the sales, but on the third trial after Rountree's death accused testified in his own behalf it was not error to require the accused to answer whether Rountree had testified on the other trials that accused sold the liquor, and whether he (the accused) had not failed to deny the statement since it was a proper method of impeaching accused's testimony, and the statute inhibiting reference to accused's failure to testify refers to the trial in a case in which he does not testify.

The *Sanders* opinion acknowledged that it was without benefit of briefs or citation of authorities, and believing the direct question had not been adjudicated (overlooking *Dorrs v. State*, supra, and *Richardson v. State*, supra), proceeded to its conclusion without citation of authority. *Sanders* stands alone. It has never been cited with approval by this or any other court in Texas and is in sharp conflict with the cases both before and after it interpreting Article 38.08, supra, and its forerunners. While it may never have been expressly overruled, it has been overruled sub silentio. Why the dissent relies upon such holding is not easy to understand.

tion to suppress evidence of a search and seizure. The State did not try to use that testimony against him at the trial on the merits, but they did, over objection, use his silence or his failure to testify about his defense of alibi at the pre-trial hearings when that subject was totally irrelevant to any issue before the court at the time and was outside the scope of the hearings. Such action was a violation of Article 38.08, supra, and of due process and due course of the law of the land (Article I, § 19, Texas Constitution) and the rule of fundamental fairness. For the totally unnecessary error, I concur in the result reached. This court has no choice. Under the circumstances, the case must be reversed.

DALLY, Judge, dissenting on appellant's motion for rehearing.

I stoutly maintain that the majority opinion on original submission correctly decides the issue on which the court now reverses this conviction. The majority opinion on rehearing sheds no light on the problem and grossly misapplies both *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Both of these cases have been improperly relied upon by the majority on the motion for rehearing.

The majority's quotation from *Simmons v. United States*, supra, is one sentence too short. The sentence immediately following the passage quoted by the majority is:

"We therefore hold that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." 390 U.S. at 394, 88 S.Ct. at 976.

Nothing said by appellant at the pretrial hearings was admitted against him at trial. He was accorded the privilege, secured by *Simmons v. United States*, supra, to testify at the suppression hearings free from the "tension" between the assertion of his Fourth and Fifth Amendment rights. The question presented in this case is whether, after appellant testified to his exculpatory story, the prosecutor was entitled to impeach appellant on cross–examination by inquiring into appellant's failure to relate the exculpatory story at the pretrial hearings. Simply stated, *Simmons* does not answer this question.

In *Doyle v. Ohio*, supra, the Supreme Court of the United States held that the use for impeachment purposes of Doyle's silence *at the time of his arrest* and after he had been advised of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), violated the Due Process Clause of the Fourteenth Amendment. In the present case we are not concerned with the admission of evidence that appellant remained silent at the time of his arrest. Again, the question is whether, after appellant testified to an exculpatory story before the jury, it was permissible for the purpose of impeachment to cross–examine him as to why he did not relate this same story when he voluntarily testified at three pretrial hearings.

In *Doyle v. Ohio*, supra, the majority of the Supreme Court expressly excluded from its consideration and holding the circumstances of the instant case. Footnote six of the majority opinion reads as follows:

"Petitioners also claim constitutional error because each of them was cross–examined by the prosecutor as to why he had not told the exculpatory story at the preliminary hearing or any other time prior to the trials.... These averments of error present different considerations from those implicated by cross–examining petitioners as defendants as to their silence after receiving *Miranda* warnings at the time of arrest. In view of our disposition of this case we find it unnecessary to reach these additional issues." 426 U.S. at 606 n.6, 96 S.Ct. at 2244 n.6.

Although in his dissenting opinion in *Doyle v. Ohio*, supra, Mr. Justice Stevens,

joined by two other members of the court, found troublesome the admission of testimony that Doyle failed to assert his "frame" defense at his preliminary hearing, he stated unequivocally that this evidence was admissible under the authority of *Raffel v. United States*, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926):

"[U]nless and until this Court overrules *Raffel v. United States* ... I think a state court is free to regard the defendant's decision to take the stand as a waiver of his objection to the use of his failure to testify at an earlier proceeding or his failure to offer his version of the events prior to trial." 426 U.S. at 632, 633, 96 S.Ct. at 2251–52.

*Raffel v. United States*, supra, was a prosecution for conspiracy to violate the National Prohibition Act. At the first trial, an agent testified that Raffel had admitted ownership of a drinking place; Raffel did not testify. The first trial ended in a hung jury, and upon retrial the agent testified as before. Raffel elected to testify and denied making the statement testified to by the agent. He was then cross-examined on his failure to testify at the first trial. The United States Supreme Court held that such cross-examination was permissible because Raffel had waived the privilege against self-incrimination by electing to testify.

The majority opinion on original submission relies upon *Raffel v. United States*, supra. That case has not been overruled by the Supreme Court, even though it had a clear opportunity to do so in *Doyle v. Ohio*, supra.

In *Raffel v. United States*, supra, the Supreme Court of the United States cited as being in accord with its holding a case from this Court, *Sanders v. State*, 52 Tex. Cr.R. 156, 105 S.W. 803 (1907). In that case, we summarized the question presented as follows:

"Appellant testified in his own behalf. On cross–examination he was asked, and required to answer in the affirmative, the following question: 'Is it not a fact that one John Rountree, now dead, on the occasion of two former trials of cases growing out of the sale of beer from the same box and at same time, testified that he, John Rountree, did not receive any money from Joe Howard for the beer in question, and he, John Rountree, did not deliver said beer to the said Joe Howard, but that you, defendant, delivered it to him; and is it not a further fact that you, defendant, did not take the stand as a witness and deny the said statements of John Rountree?'"

This Court held that questioning Sanders about his failure to testify in the earlier, related cases was a legitimate way of impeaching his testimony. That opinion went on to state that such questioning did not constitute a reference to Sanders' failure to testify because he had taken the stand and testified.

*Raffel* and *Sanders*,[1] not *Doyle* and *Simmons*, are clearly controlling. I would follow the controlling decisions and not run ahead of the Supreme Court of the United States to reverse this judgment.

The majority, apparently apprehensive and insecure in basing its decision on federal grounds, also attempts to bottom its decision on state law. In so doing, the Court introduces a new and dangerous holding: "that Article 38.08 ... applies to a defendant's silence on some matters at a pretrial hearing even when he does testify at that hearing about other matters."

Art. 38.08, V.A.C.C.P., offers no more support for the result reached by the major-

---

[1]. In footnote 3 of the concurring opinion on Appellant's Motion for Rehearing, *Sanders v. State*, 52 Tex.Cr.R. 156, 105 S.W. 803 (1907), is discussed and the statement is made: "Why the dissent relies on such holding is not easy to understand." To explain and to reiterate, *Sanders v. State*, supra, has before today never been overruled by this Court and it was cited with approval and followed by the Supreme Court of the United States in *Raffel v. United States*, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926). The Supreme Court has never overruled *Raffel; Sanders* and *Raffel* should be followed in this case.

ity than do *Doyle* and *Simmons.* Art. 38.08 prohibits references to the defendant's failure to testify. Appellant did not fail to testify; he testified both at the pretrial hearings and at the trial. In *Sanders v. State,* supra, which the majority is apparently overruling in order to reverse this conviction, this Court stated:

> "The statute [now Art. 38.08, V.A.C.C.P.] inhibiting a reference to the failure of defendants to testify refers to a case on trial in which he had not testified. That ground of objection could not apply here, because appellant took the stand and testified."

When the accused testifies, he assumes the character of a witness and may be contradicted, discredited, and impeached like any other witness. *Fitzpatrick v. United States,* 178 U.S. 304, 20 S.Ct. 944, 44 L.Ed. 1078 (1900); *Brown v. United States,* 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958); *Valerio v. State,* 494 S.W.2d 892 (Tex.Cr. App.1973); *Burton v. State,* 67 Tex.Cr.R. 149, 148 S.W. 805 (1912).

Even if the majority concludes that it was error to impeach appellant by his silence at the pretrial hearings, it should also conclude that such error was harmless beyond a reasonable doubt. Two of the San Antonio police officers who investigated this case testified before the jury that appellant told his exculpatory story to the police following his arrest. Thus, the jury was aware that appellant's testimony was not a recent fabrication, but was consistent with the statements he had made to the police from the time of his arrest. The impeaching effect of appellant's silence at the pretrial hearings must be considered in this context. So considered, the error perceived by the majority is clearly harmless. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *Chapman v. United States,* 547 F.2d 1240 (5th Cir. 1977).

I dissent to the majority opinion on the appellant's motion for rehearing and would affirm this judgment.

DOUGLAS and W. C. DAVIS, JJ., join in this opinion.