Wiley Michael COLEMAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 3–82–102–CR.

Court of Appeals of Texas, Austin.

Dec. 1, 1982.

Roy E. Greenwood, Austin, for appellant.

Jeffrey L. Van Horn, Crim. Dist. Atty., Todd A. Blomerth, Asst. Crim. Dist. Atty., Lockhart, for appellee.

Before PHILLIPS, C.J., and EARL SMITH and BRADY, JJ.

EARL W. SMITH, Justice.

In a jury trial, appellant Wiley Michael Coleman was convicted of the offense of aggravated robbery; punishment was assessed at confinement in the Texas Department of Corrections for 15 years.

Appellant contended (1) that the evidence is insufficient to support the conviction, and (2) that the trial court erred in overruling appellant's objection to the prosecution's improper attempt to cross-examine appellant concerning his post-arrest silence and his failure to tell the grand jury his version of the event in question.

## I.

■ We will first consider appellant's second ground of error. Appellant testified, denied commission of the offense, and offered the affirmative defense of alibi.

During cross-examination by the prosecuting attorney, the following occurred:

Q: Well, this story that you are telling this jury here today, did you tell the Grand Jury this story. I mean did you come up and say, hey, I've been wrongfully arrested and harassed by

the Caldwell Police Agency. Did you tell the Grand Jury? Did you come up here and tell the Grand Jury that?

A: We didn't tell them that.

Q: Did you tell them that prior to your indictment in this case. Yes or No?

A: I've never been put on the stand.

Q: So you didn't voluntarily come up here and tell the Grand Jury that, did you?

At this point defense counsel, Gossett, interposed an objection, stating, "Your honor, I object to that question. I've been practicing law for seven years and I've never got in to talk to a grand jury, and for him to imply that this man had an obligation to do so is totally ridiculous." The trial judge overruled the objection and instructed the appellant to answer the question, whereupon the prosecuting attorney pursued his line of questioning by again asking, "Did you voluntarily come up and ask to talk to the Grand Jury, which is your right, about this case before you were indicted. Yes or No?" The defendant answered in the negative.

It is clear that the prosecutor's questions as to appellant's post-arrest silence and his failure to appear before the grand jury and give testimony was a violation of his constitutional rights guaranteed to him under the Fifth and Fourteenth Amendments to the United States Constitution and art. 1, § 10, Texas Constitution.

■ Under existing law, once the defendant takes the stand, he is subject to the same rules as any other witness, that is, he may be contradicted, impeached, and made to give evidence against himself. *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980); *Myre v. State,* 545 S.W.2d 820 (Tex.Cr.App.1977).

However, there are important constitutional limitations on this general rule. In *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) the defendant was arrested for selling marijuana. At that time, he made no statement to the police. During his trial, he testified that he had been framed. The prosecutor impeached

the defendant's credibility by revealing that the defendant remained silent after his arrest. Conviction was reversed by the Supreme Court, stating that it is fundamentally unfair and a violation of the defendant's due process rights to draw unfavorable inferences from what may be an exercise of the defendant's right to remain silent under *Miranda. See also United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975); *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

Furthermore, the Supreme Court has held that, where the defendant does appear before the grand jury but exercises his Fifth Amendment right to remain silent, if he later takes the stand in his own behalf, he may not be impeached with his earlier refusal to testify. *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). In *Franklin v. State,* 606 S.W.2d 818 (Tex.Cr.App.1979) the trial court allowed the State to cross-examine the defendant regarding his failure to testify at pre-trial hearings about the exculpatory matters to which he testified at trial. The Court reversed, holding that it is impermissible to allow comment at trial on the accused's exercise of his constitutional privilege against self-incrimination during pre-trial hearings, citing *Simmons v. United States,* 390 U.S. 377, 393–94, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). In *Franklin,* the Court also held that Tex.Code Cr.P.Ann. art. 38.08 (1979) prohibited comment on a defendant's failure to testify at the pre-trial hearings about the exculpatory matters testified to at trial.

Article 38.08 reads:

Any defendant in a criminal action shall be permitted to testify in his own behalf therein, but the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause.

The predecessor to this article [Tex.Code Cr.P. art. 790 (1925) ] has been held applicable to pre-trial hearings. *Armstrong v. State,* 135 Tex.Cr.R. 333, 125 S.W.2d 578

(1939); *Scroggin v. State,* 97 Tex.Cr.R. 573, 263 S.W. 303 (1924).

In *Hawk v. State,* 482 S.W.2d 183 (Tex. Cr.App.1972) the Court held that comment about the silence of the accused during arrest violates Tex.Code Cr.P.Ann. art. 38.22 and the Fifth Amendment to the U.S. Constitution, stating:

> In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege. . . . The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of an accusation.

■ The State challenges the sufficiency of appellant's objection. Though not carefully worded, the objection clearly put the prosecutor and trial judge on notice that the prosecutor's line of questions invaded the constitutional rights of the defendant to remain silent by not appearing before the grand jury. Appellant's second ground of error is sustained.

## II.

We turn now to the sufficiency of the evidence to support the conviction. The evidence must be discussed at length.

James Earl Perry, the 82-year-old victim, testified that he lives about a mile west of Tilmon in Caldwell County. His niece, Tommie Ballew, lives two miles "down south" of him. On the 13th day of April 1981, he was robbed by three black males, while he was listening to the Alan Dale radio show, which he "imagined" came on at 1:30 P.M. or "better." (The show, he said, "comes on at one, now.") One of the robbers threatened to kill him, and to cut his throat. Perry tried to reach his gun but the robber who threatened him obtained it and made Perry tell him where his money was. The one who threatened him took his money purse; a gold knife, fork, and spoon; two driver's licenses (an old one and Perry's new one); a Medicaid card; eleven or twelve dollars (two five dollar bills and one or two "ones"); his .22 caliber nine-shot pistol; and possibly some old pictures.

The other two men stood silently throughout the robbery. One of the three at some time apparently cut the telephone wire. Perry could not identify any one of the three individuals who robbed him, nor the car in which they apparently left. He did not know which way they went. He stayed in bed about five minutes, then put on his shoes, and drove to Lloyd Taylor's (a neighbor), about one mile away. He drove slowly and it took him eight to ten minutes to get to Taylor's. There, at first, he could not arouse anyone, but he kept "hollering" and Taylor's sister, Mrs. Lampkin, came out. Perry told her to telephone the Sheriff, his sister, and his niece, which she did. When asked whether he could identify any of the individuals who robbed him, Perry said, "Well, I couldn't conclusively. Now I know one of them. I think I might, but I wasn't positive." His eyesight is bad.

He knows James Durham, who married a girl living near him. Durham had been in his home many times, and had taken him to the doctor. James Durham was one of three black males, including appellant, who were later arrested for the robbery. The record is clear that Perry never identified Durham nor either of the other men; it is also clear that he did not furnish any description of the vehicle in which they left. He was specifically asked if he could identify appellant, in court, and could not do so.

Zera Lampkin testified that she lived one mile from Perry. On the date of the robbery, Perry came to her house in his car between 2:30 and 3:00 P.M. Perry told her what happened, whereupon she called his family and then the Sheriff's Department. She told the Sheriff's Department what happened. She was given no identification by Perry of the car the robbers left in, and doubted that he could have seen it.

Dean Reed, Sheriff of Caldwell County, testified that when his office is notified of a crime and is given a description of a suspect, the dispatcher taking the case will "put it out over the radio to all the units in the surrounding towns or county . . . ." On the date of the robbery, there had been an escape by a prisoner in his jail and he had

received information that the escapee was in Seguin. He and Deputy Sheriff Ed Brown left for Seguin in Brown's pickup to check out the information. The pickup was Brown's personal vehicle. Their route of travel was through Martindale and Staples to Seguin. Enroute, at about 3:15 P.M., they received a report of a robbery in the Tilmon area. As they left Staples, they met a car in their lane of travel going pretty fast. They pulled over to let it pass and then saw three black males in it. As he and Brown pulled over to let the car pass, the car "really shot the gas to it." This looked suspicious, so they "took in after them." Brown and the Sheriff lost sight of the car almost immediately, but "chased them." Brown "got up" to eighty miles-per-hour during the chase. About seven miles out of Staples *back toward San Marcos,* they saw the car beside the road. A black male stood outside near the trunk area of the car and two more black males a small distance up the road were walking down a driveway toward a house a small distance up the road. The man at the trunk of the car started opening it, but did not get anything out of the trunk. The house was seventy-five "miles" [sic] off the highway. The two black males were at the gate which runs along the bar ditch. One of the two stooped and reached down by the gate and then "took off." The Sheriff had no idea which of the two did this. The Sheriff knew James Durham, who was at the trunk of the car, and Earl Durham, who was one of the two going up the driveway. He identified the appellant in court as the third individual.

He further testified that Ed Brown found a gold knife, a gold spoon, a gold fork, and a small knife, wrapped in a handkerchief on the ground in front of the car. Also, where Brown saw the "colored" subject stoop down, he found a stack of papers among which was Mr. Perry's old driver's license. None of the items recovered was found in the automobile or on the person of any of the three suspects. All of the items were found "lying somewhere on the ground in that vicinity." The suspects' automobile was out of gas. James Durham told the Sheriff that the group had been to Prairie Lea, and were going to San Marcos. The customary route from Prairie Lea to San Marcos is by way of Highway 80. The appellant, Wiley Coleman, is from San Marcos. When the Sheriff first saw the automobile, it was 20 to 30 miles from Perry's house. There was nothing on Deputy Brown's pickup to identify Brown and the Sheriff as law enforcement officers. All three suspects were searched. No fingerprints were taken at the scene of the robbery. James Durham and Earl Durham knew the Sheriff, his deputies, and their vehicles.

Ed Brown testified to the "chase," and of coming upon the three black suspects when their car ran out of gas. It was pulled over to the side of the road. James Durham was at the trunk of the automobile, apparently trying to find a gas can. The other two men were walking up the road in front of the car and had turned into a driveway leading up to a house. One of the individuals stooped down as he was going through the gate, "like he put something down or something." The officer did not know which of the individuals did this. He identified the appellant as one of the three men he saw when their automobile was stopped. Appellant was one of the two walking toward one of the houses. Directly in front of the car was found a gold spoon, knife, and fork in a handkerchief. They were found in the open, lying on the ground. "On the corner there in the driveway of this house," was found a little black coin purse and in it was Mr. Perry's driver's license. The purse was located in the same area where one of the two individuals had stooped down. No Medicaid card was found and no pistol was found in anyone's possession.

Brown did not know if any money was found on any of the suspects. He had testified (in the motion to suppress hearing) that, "he did get a description over the radio of an older brown car," but said he could be mistaken—that, "they may not have given that report."

Tommie Nell Ballew testified that Perry was her uncle, and that she lived about two miles from Perry. On the day of the robbery, she received a call from her aunt, Sadie Perry, who told her that Mrs. Lampkin had informed her about the robbery. She described Perry's condition after the robbery. She identified the knife, fork, and spoon found by the officer as her uncle's property. She knew James Earl Durham, who lived in a trailer house on the property of Travis and Addie Davis, about a mile across the field from where her uncle lived. James Durham's wife worked at one time for Perry. Durham was in Perry's house on occasion, and took Perry to see his doctor in Austin several times.

The State rested and the defense offered testimony from three witnesses. Grace Sanders, mother of appellant, and a resident of San Marcos, testified that on the date of the robbery, appellant and two other young men (James and Earl Durham) came by to visit her, a little after 12:00 noon. They stayed 35 or 40 minutes, and left between 12:45 and 1:00 P.M. They were not in appellant's automobile.

The appellant testified that he, James, and Earl Durham were cousins. On the date of the robbery James and Earl Durham visited him at about 11:30 that morning. They indicated to appellant that one of them was supposed to pick up his wife's clothing in Martindale and in Luling, and they asked appellant if he would ride with them. "They" were supposed to be moving to San Antonio or New Braunfels. They went to Gracie Mayweather's house where they stayed until about 12:00 noon and then went to appellant's mother's house. After visiting her, they proceeded to Aunt Hennie's house, staying there 15 or 20 minutes, and then proceeded to Martindale. They were at Aunt Hennie's in San Marcos about 1:00 P.M., leaving about 1:15 P.M. They left Martindale on their way to Luling, found they did not have enough gas, and were going to stop for gas in Prairie Lea; however, the filling station was closed. Appellant suggested they go to Staples. At Staples, they did not see a gas station, so they "kept going," moving at a pretty good

rate of speed. They ran out of gas, and this was when the police came.

Appellant denied being involved in the robbery in any way; he denied being present. When the officer arrived, James was at the back of the car, and appellant and Earl were going up the driveway to get a gas can. A truck pulled up, so he and Earl started walking back to the car. He did not know the occupants of the car were police officers. This was the first time he had even seen the officers. Appellant and his companions were searched, as was the car. He denied seeing any of the "stuff" found by the officer. The first time he ever saw "those items" was when the officers showed them to him in Luling. Appellant was employed by Houston Construction by day and at night by Adkins Construction. He did not have any money on him when arrested. He did not know Perry, and had never been on his premises.

Appellant stated that it was likely that from 2:00 to 2:30 he was in Martindale picking up the clothes "on our way to Luling." He had never seen any of the State's exhibits until he was taken to Luling. On cross-examination, he was asked about his failure to appear before the grand jury as hereinabove set out. He denied "stooping down" where the coin purse was found, and did not see his companion do so.

Appellant then offered a witness, Reverend Washington, who testified as to his good reputation for truth and veracity.

The only items offered by the State as having been found in the vicinity of the car when the officers made their search were a gold knife, a gold fork, a gold spoon, and Perry's driver's license. None of the items were found on the person of any of the three suspects, nor in the automobile.

There is no evidence in the record that anyone ever saw appellant or his companions at Perry's house, or even in the vicinity. There is no direct evidence that appellant or his companions ever possessed the knife, fork, spoon, or driver's license. Apparently, no money was found on appellant or his companions. The pistol was not

found at all, none of the items found were tested for fingerprints, nor was Perry's home. At the hearing on appellant's motion to suppress, the State argued that, "This stuff was found out in the open and not in anybody's possession." Now, on appeal, it is the position of the State that these items were once in the possession of appellant and his companions, but were abandoned by them, and that appellant was therefore recently in unexplained possession of property taken from the robbery, creating a presumption that appellant was present at the scene of the offense and actually committed the offense.

In support of this theory, the State, in its supplemental memorandum, cites *Washington v. State,* 518 S.W.2d 240 (Tex.Cr. App.1975) and *Bonner v. State,* 492 S.W.2d 498 (Tex.Cr.App.1973). In *Washington v. State, supra,* three men were placed in the getaway car near the store where the robbery occurred; the car bore the description and license plate number of a vehicle belonging to the appellant. The driver of the car was observed wearing a hat similar in description to the one appellant was wearing when he was arrested. Appellant and two other men were arrested a few minutes after the robbery in a car which had been observed at the scene. Money was found on the ground near the door of appellant's automobile in the amount and denominations taken in the robbery. A knife was used in the robbery, and in the search of appellant's vehicle, a knife was found under the front seat.

In *Bonner v. State, supra,* the defendant was found in unexplained possession of money in the exact amount which had been taken by the robber and the robbery victim's watch was found in the automobile in which the defendant was a passenger. Clearly, *Washington* and *Bonner* are to be distinguished from the facts in this case.

This is a circumstantial evidence case and the jury was so charged. The case was submitted to the jury on the theory that appellant could be found guilty if he, acting alone, or acting together with others, as a party, committed the offense.

■ In determining whether circumstantial evidence is sufficient to support a conviction each case must necessarily be tested by its own facts and viewed in the light most favorable to the State. Ordinarily, the test on appeal is whether there was evidence from which the jury (advised of the restrictions which the law places upon them in condemning one on circumstantial evidence) might conclude that every reasonable hypothesis than guilt was excluded. *Ysasaga v. State,* 444 S.W.2d 305 (Tex.Cr. App.1969). There the Court said:

In criminal cases, a judgment of conviction, to be sustained on appeal, must be supported by evidence that produces a moral certainty of the guilt of the accused to the exclusion of every reasonable doubt. The evidence will be insufficient to sustain the conviction where, although not leaving the accused free from suspicion of guilt, it still fails to show his guilt to a moral certainty, so as to exclude all reasonable doubt.

In ascertaining whether the guilt of the accused has been established to a moral certainty, the appellate court will review the evidence in light of the presumption that the accused is innocent. The Court will not presume any acts against the accused that are not shown to have been committed by him. Furthermore, a conviction will not be sustained on appeal if the evidence does not sufficiently establish all material elements of the offense charged.

■ There is no direct evidence that appellant was ever in the vicinity of the crime. Here, the State puts emphasis on "the chase" as evidence of flight. Mere presence in the vicinity of a crime and flight are not alone sufficient to support a conviction. *Drager v. State,* 555 S.W.2d 743 (Tex.Cr.App.1977); *Moore v. State,* 532 S.W.2d 333 (Tex.Cr.App.1976); *Ysasaga v. State, supra.*

■ A conviction based upon circumstantial evidence cannot be sustained unless the circumstances exclude every other reasonable hypothesis except that the accused is

guilty. Proof which amounts only to a strong suspicion or mere probability is insufficient. *Dixon v. State,* 541 S.W.2d 437 (Tex.Cr.App.1976); *Moore v. State, supra; Higgins v. State,* 515 S.W.2d 268 (Tex.Cr. App.1974).

Without relating the lengthy facts in *Dixon v. State, supra,* the circumstances of guilt appear to be much stronger than in this case; yet the case was reversed for insufficiency of evidence.

■ The State relies heavily on the finding by the officers of items belonging to the victim in the road in front of the automobile in which appellant was a passenger and the finding of another item at a point in a road leading up to a house, where either appellant or his companion was seen to "stoop over," as showing recent possession by appellant of items taken from the robbery. The officers did not see appellant or his companions in actual possession of such items—the theory being that they were once in possession thereof and thereafter abandoned same. The evidence falls far short of ruling out every other reasonable hypothesis to a moral certainty. For example, another reasonable hypothesis would be that such items were discarded by others. As to the "stooping over incident," it is a reasonable hypothesis that as appellant and his companion walked toward the house, one of them saw the items lying on the ground, and stooped over to see what they were. It is significant that no pistol or money was found in the possession of any one of the three suspects.

Because of the insufficiency of the evidence, the judgment of conviction is set aside and reformed to show acquittal. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Schershel v. State,* 575 S.W.2d 548, 551 (Tex.Cr.App. 1979).